Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor

v.

FREEWAY CONSTRUCTION COMPANY.

Civ. A. No. 79–0350.

United States District Court, D. Rhode Island.

Nov. 17, 1982.

David L. Baskin, Boston, Mass., for plaintiff.

Michael Horan, Pawtucket, R.I., for defendant.

## OPINION

SELYA, District Judge.

This is a suit brought by the Secretary of Labor [1] on behalf of William Kuusela, Paul Robinson, Roger Pussinen, and Leonard Pussinen, all of whom were employed by the defendant Freeway Construction Company ("Freeway"). The keystone of the complaint is that the four named employees (hereinafter collectively referred to as "complainants") were discharged as a retaliatory measure for complaints lodged by them in respect to safety and health conditions at a job site in violation of the Occupational Safety and Health Act, 29 U.S.C. § 660(c)(1) ("Act"). The Act prohibits an employer from discharging or discriminating against an employee who files a complaint about health or safety hazards with the employer or with the Occupational Safety and Health Administration ("OSHA"). Jurisdiction is based on 29 U.S.C. § 660(c)(2). Plaintiff seeks injunctive, monetary and other related relief.

The case was tried to the Court on October 26, 27, 28, 1982.

The evidence adduced at the trial makes this litigation, regrettably, a perfect role model justifying the enactment of protective statutes such as 29 U.S.C. § 660(c)(1). When the economic leverage of an employer can be brought to bear to jeopardize the legitimate quest for adherence to minimum on-the-job safety and health standards, the will of the Congress and the salutary objectives of progressive legislation are equally threatened.

### Findings of Fact

On September 30, 1977, the Department of the Navy awarded to Freeway a contract [2] for the performance of certain carpentry and painting work at the Nautilus Park housing complex located at the Naval Submarine Base, New London-Groton, Connecticut. The work required carpentry crews to reverse the existing siding on 500 housing units, whereupon painters were to complete the contract work by refinishing the reversed siding. Both the carpentry and painting effort were within the scope of Freeway's contract.

Charles Clear, the vice-president of Freeway, hired complainant William Kuusela, who was known by Clear to be an experienced carpenter. At Clear's suggestion, Kuusela elicited the interest of the remaining three complainants, all of whom were hired subsequently by Clear to perform carpentry work. When work commenced on or about April 3, 1978, Kuuselá was paid $9.00 an hour [3] and the other three complainants were paid at a rate of $8.00 an hour. During April of 1978, the hourly wages of complainants Paul Robinson, Leonard Pussinen and Roger Pussinen were raised to equal that received by Kuusela. The Court finds

1. The action was originally brought on July 16, 1979 in the name of Ray Marshall, then Secretary of Labor. Plaintiff's parol motion, at trial, to substitute Raymond J. Donovan, the incumbent Secretary of Labor, as party plaintiff, was granted by the Court.

2. The contract was designated N 62472–77–C–0437 and was modified by the issuance of a no-cost change order on March 3, 1978. Plaintiff's Exhibit # 10.

3. There is some contradictory evidence as to Kuusela's claim of entitlement to an incentive bonus in addition to his hourly wage. He contends that he negotiated an oral contract with Freeway for a bonus of $50/housing unit. The defendant denies that Kuusela was promised a bonus for each unit completed. This dispute is discussed in greater detail, *infra*.

that the pay raises indicate that the three complainants affected thereby were performing their job tasks in an acceptable manner. In addition, the Court finds no credible evidence to rebut the plaintiff's contention that the complainants were competent and efficient carpenters.[4]

Safety conditions on the job are a matter of considerable controversy between the parties. It was the testimony of the complainants, supported by the depositions of two fellow carpenters, that safety concerns were honored considerably more in the breach than in the observance. The evidence adduced by the government demonstrated that a myriad of unsafe conditions existed at the job site, including, but not limited to, the absence of appropriate sanitary facilities, the employment and use of old, unsafe ladders and inadequate staging, the utilization of ungrounded extension cords supplied by Freeway, and the inordinate risks inherent in requiring carpenters to remove energized cable. Although the defendant sought to rebut the existence of these hazards, the Court finds that the complainants' testimony, supported by a detailed citation from an OSHA inspector,[5] is far more credible than the evidence proffered by defendant's witnesses. The Court, therefore, finds that numerous safety and health violations existed at the job site during April and May of 1978, making the job site demonstrably unsafe. Having had an opportunity to observe all of the witnesses, the Court concludes that Freeway conducted its contract work with what can best be characterized as a callous disregard for the health and safety of its crews.[6]

The complainants, especially Kuusela, regularly expressed grievances over job safety to Freeway's project superintendent at the job site, one Richard Imondi. In some instances, Kuusela, acting as spokesman for the complainants, expostulated on this same subject with Clear.[7] This course of conduct proved unavailing, and the complainants, as a last resort, decided to contact OSHA in Hartford, Connecticut.

The complainants, with little time to themselves during working hours, asked Paul Robinson's mother (Marge Robinson) to call OSHA on their behalf, explain the situation, and register the complaint. She did so on Thursday, May 4, 1978.[8] Coincidentally, at the close of work on May 4th, the complainants were instructed to take time off to permit painting crews to reduce their backlog of unfinished units. All parties agreed that the carpenters had outpaced the painters and that a catch-up period was required. The parties disagree, however, as to when the complainants were told to return to work. Imondi testified that he told the complainants not to report to work until Monday, May 15. The complainants testified that Imondi told them to resume work on Tuesday, May 9. The deponent, Hughes, agreed with the latter version. The Court, as trier of fact, finds that the complainants were indeed instructed to return to work on May 9th.

---

4. In the deposition of Thomas Blevins, a fellow carpenter, entered in lieu of testimony as plaintiff's Exhibit # 8, deponent stated: "They [the complainants] were the fastest and best carpenters on the job." Blevins Deposition, at 42. The Court accepts this statement.

5. Defendant's Exhibit C.

6. Freeway offered as evidence the testimony of one William T. Fizzano. Fizzano was not an impressive witness. His appearance and demeanor left much to be desired. He was listed as a painter in the employment records and was paid at a painter's rate. He testified, nonetheless, that he was a carpenter on this job. Moreover, he worked for Freeway again in 1980, and expressed at trial a desire to work for Freeway again. Thus, he was not a truly disinterested witness. The Court has, throughout this Opinion, considered Fizzano's testimony, but has in large part rejected it.

7. Although Imondi and Clear denied that such complaints were made, the Court does not find their disclaimers worthy of belief. The government inspectors' failure to recollect such remonstrances is not persuasive on this issue as they were not directly concerned with job safety.

8. Although some doubt was raised as to the date of this telephone call and as to the date of Paul Robinson's call (discussed *infra*), the Court finds that the May 4th and 5th dates are accurate. In any event, OSHA must have been contacted prior to conducting its inspection of May 8, 1978.

874

Robinson, freed from his regular work schedule on Friday, May 5th, then called OSHA to reaffirm the complaint lodged by his mother the previous day. This call was made on behalf of all of the complainants, as was the earlier call. Responding to this stimulus, an OSHA inspector, one Romas Bassone, appeared at the job site on Monday, May 8, and conducted a complete safety inspection. Bassone observed numerous safety deficiencies, including some specifically cited by the complainants.[9] Bassone testified that he advised Clear and Imondi that the inspection resulted from a complaint lodged with OSHA, without revealing the origin of the complaint. Clear then remarked to Bassone: "We know where the complaint came from." Clear and Imondi, predictably, denied Bassone's testimony regarding the etiology of the inspection and the statement allegedly made by Clear. Such self-exculpation rings false to the Court, especially since Bassone was a credible witness. Although there is no "smoking gun", per se, logical inferences are permissible; the Court finds that Clear was either surreptitiously informed or accurately guessed that the grievance originated with the complainants.

On the following day, the men reported to work but left because of inclement weather. The complainants returned to the job site at the usual time on Wednesday, May 10. The testimony conflicts as to what then transpired. Imondi testified that the complainants, incensed at their temporary layoff, decided to quit, and demanded their checks and pink slips (whereupon Imondi notified Clear, who proceeded to the Base to deliver same). Clear supports Imondi's testimony both in this regard and as to the suggestion that the complainants were not scheduled to return to work until May 15th. Clear and Imondi both aver that they offered the complainants the opportunity to resume work on the last-mentioned date, but that the men refused and voluntarily terminated the employment relationship.

9. See Defendant's Exhibit C for a compilation of Bassone's findings.

10. Plaintiff's Exhibits # # 2, 3, 4 and 5.

The complainants' testimony is diametrically opposed to this evidence. They state, in substance, that they reported to work on May 10, were told by Imondi that they were through, demanded pink slips and paychecks, and thereafter received the same from Clear. At least two of the complainants also testified that there was a heated discussion between Clear and Kuusela, in which Clear (according to Kuusela and Roger Pussinen) allegedly told Kuusela:

"I do not have to take this shit from you assholes"

(a comment which makes up, to some extent, in anatomical symmetry for what it lacks in sophistication of vocabulary). Clear vehemently denied making the statement, and further denied that the OSHA investigation had anything to do with the complainants' severance. The Court accepts the complainant's version of the events of May 10th, and rejects the contrary version offered by Freeway. The Court specifically finds that the excremental reference quoted above was made by Clear, and that it referred to the instigation of the OSHA inquiry.

Clear and Imondi would have the Court believe that the complainants voluntarily quit after temporarily being laid off. Freeway attempted, however, at various points in the trial, to prove that the complainants told younger carpenters to slow down so they could "milk the job." If the complainants sought to milk a job because of exceptionally high wages and proximity to their homes, it is difficult to believe that these men, acting rationally, would let a one week layoff cut short such a desirable sinecure. Further, the pink slips received by the complainants from Clear on May 10th[10] were dated May 8th. This evidence contradicts Clear's assertion that the slips were not prepared until Imondi told Clear on May 10th that the complainants had resigned.[11] While Clear's daughter testified

11. Each slip also showed "lack of work" rather than "voluntary quit" as the reason for termi-

that she had made a *quadruple* clerical error in typing all four of the slips, the Court concludes that filial loyalty motivated her testimony rather than a search for the truth. The Court finds that the pink slips were in fact prepared on May 8th, prompted by Clear's fury at the invasion of his job site by an OSHA inspector.

Ever ready with alternative justifications, Freeway also insinuated, both during the OSHA investigation as to reprisal firing (discussed *infra*) and at the trial, that the complainants were fired for poor job performance. This, according to Freeway, included slow, inefficient work and damage to siding and to tools. The Court must reject this contention as well. Admittedly, some of the siding broke, but the siding was brittle, old, and susceptible to breakage. Additionally, no credible evidence indicated that the complainants were afflicted with this problem any more or less than any other carpenters on the job. The claim of slothful carpentry work must also be rejected. All parties in interest agree that the carpenters had to take time off to permit the painters to catch up. If the complainants, who were lead carpenters, were not working efficiently, the Court cannot fathom how such a disparity between the pace of the painters and of the carpenters could have developed. It appears to the Court that the converse is true: the complainants were the best carpenters on the job.[12]

The holes which permeate Freeway's story become even more cavernous when one considers that all of the other carpenters (excepting only Hughes and the complainants) worked a full day on May 10th and for the rest of the week; and that two new carpenters, John Scovish, Jr. and Richard McQuown, reported for work *for the first time* on Wednesday, May 10th and worked an eight hour day on that occasion, and thereafter for the rest of the week.[13] In addition to McQuown and Scovish, the Porretta brothers appear to have been hired on May 11th and to have worked eight hour days on May 11th and May 12th.[14] If these carpenters were hired as additional carpenters to handle the workload,[15] then the Court must reject the contention that Clear and Imondi wanted the complainants to take a ten day layoff in order to permit the painters to overtake the carpenters. Most damning of all is the inaugural appearance by Scovish and McQuown for an eight hour work day on Wednesday, May 10. The contention that they were hired to replace the complainants when the latter quite simply does not hold water. The Court cannot understand, on that hypothesis, how McQuown and Scovish could have worked a full day when the complainants supposedly quit *after* the day's work had begun; nor does the perceived need to work on May 10th, 11th, and 12th square with the fiction that the complainants had been temporarily laid off until May 15th. By way of further augmentation of this conclusion, the work records of the defendant show that the amount of work steadily increased through the end of May. This is evidenced by the number of the carpenters employed at the beginning of May compared to the increased number employed at the end of May.[16]

Throughout the deposition, testimony of carpenter Francis Hughes buttresses the complainants' description of the facts. Hughes was a disinterested witness and had

---

nation, thereby further undermining the already-shaky defense.

12. See note 4 *supra;* and see the deposition of Francis Hughes, entered in lieu of testimony as Plaintiff's Exhibit # 9, to the effect that Clear had referred to Roger Pussinen and Kuusela as "aces." An "ace" is a colloquialism in the trade for a first-rate carpenter. *See* Deposition of Francis Hughes at 12.

13. See Plaintiff's Exhibit # 7, weekly payrolls for May, 1978; specifically, sheets for week ending May 13.

14. *Id.*

15. This Court can think of no reason other than workload for Freeway to hire additional carpenters; the payroll records as viewed by the Court brand Freeway's assertions as pretextual.

16. Plaintiff's Exhibit # 7.

no real relationship with any of the complainants. Like them, however, Hughes was temporarily laid off so that the painters could make up ground on the carpenters. His testimony supported the testimony of the complainants pertaining to the date of recall from layoff; the unsafe working conditions at the site; and the remonstrances to Imondi regarding safety hazards. Most inculpatory to Freeway is Hughes' testimony regarding the conversation he claims to have had with Clear and Imondi on May 11th about resuming work. The Court takes as true Hughes' version of the discussion. Hughes protested to Clear and Imondi that he was not part of any "troublemaking clique", and he was permitted to return to work on this basis. During the discussion, Clear told Hughes about the problems Freeway was having, including "guys causing headaches on the job that he [Clear] didn't need." [17] The Court infers that the "headaches" constituted, in the context of the conversation, a thinly-veiled reference to the instigation of the OSHA inspection. Hughes expounded on this testimony under cross-examination. When asked what he meant by a "troublemaking clique", Hughes responded: "[t]hat the way Charlie [Clear] and Richie [Imondi] were talking about these four gentlemen from Plainfield [the complainants], I was included in that problem causing team." [18] He also testified that Clear and Imondi were more concerned about the "guys from Plainfield being troublemakers" than they were over the high wages which Freeway was paying the complainants. [19]

Subsequent to the confrontation with Clear on May 10th, complainants toured the job site and compiled a list of complaints. They then departed, subsequently deliver-ing the check list to the Naval Engineering Command.[20] Robinson then notified OSHA by telephone of the dismissals. OSHA began an investigation of the terminations, which was delayed somewhat by bureaucracy-as-usual and by personnel movements. In November of 1978, OSHA requested a written statement of defendant's position. Freeway responded to the charges, advising OSHA in substance that the complainants were fired for unacceptable work. After receiving this written explanation, OSHA investigator Matthew Gilmartin met with Clear and Imondi. Gilmartin testified that he questioned Clear about certain inconsistencies in Freeway's position including, but not limited to, the "pre-dating" of complainants' pink slips to May 8th. Clear's explanations to Gilmartin were untrue to his name.[21] The instant litigation ensued.

While the memories of witnesses to events occurring some four years prior to the actual trial were understandably imperfect, the Court, on the whole, found the complainants to be substantially more credible than the officials of Freeway who testified during the defense case. The Court was particularly impressed with the testimony of Paul Robinson, who appeared to be exceptionally earnest. The Court further found the two OSHA officials who testified, Bassone and Gilmartin, to be candid and truthful.

*Conclusions of Law*

Defendant has raised both procedural and substantive defenses to the action.

First, defendant claims that the case is improperly brought because the government failed to comply with 29 U.S.C. §§ 657(f)(1) and 660(c)(3). 29 U.S.C. § 657(f)(1) provides in pertinent part:

17. Deposition of Hughes at 30–31 (Exhibit # 9).

18. *Id.* at 47.

19. *Id.* at 51. It is true that the complainants were paid more than most of the other carpenters. This was not, in the Court's judgment, the raison d'etre for complainants' dismissal. The wage level of complainants further undercuts Freeway's claim that complainants were incompetent craftsmen. It suggests strongly that complainants would not have departed voluntarily to search for other employment at the lower "going rate". As noted *infra*, the three complainants who found work post-discharge received a substantially lower hourly wage.

20. Defendant's Exhibit B is a copy of this "check list".

21. I.E., less than Clear.

(f)(1) Any employees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employees or representatives of employees, and a copy shall be provided the employer or his agent no later than at the time of inspection.

Defendant contends that Bassone failed to provide a copy of the notice at the time of inspection, that the same was in any event not signed by the employees, and that the instant action is therefore barred. Defendant also argues that failure to provide notice of the reprisal-firing violations until November 17, 1978 fatally offended defendant's due process rights. The Court finds both contentions without support in the authorities.

In the first instance, § 657(f)(1) of the Act applies by its terms to investigation and prosecution of safety and health standard violations. If the defendant was being brought to bar for unsafe or unsanitary work place conditions and was contesting the issuance of the citation in this proceeding, portions of the argument might have weight.[22] That, however, is not the case. The safety violation claim itself was previously resolved and is not an issue in this action. The presence or absence of safety violations is not before the Court in an action under § 660(c)(1) of the Act. The crux of § 660(c)(1) litigation is whether the employer's actions against the employee were predicated upon the employee's filing of a complaint or engagement in other protected activity. Had Freeway been as pure as the driven snow in its maintenance of the work-place, and had it nevertheless fired complainants for urging OSHA to investigate, the instant action would still lie, so long as the complainants had acted (as they palpably did in this case) in good faith. *Marshall v. N.L. Industries, Inc.,* 618 F.2d 1220 (7th Cir.1980).

Moreover, an OSHA investigation into the firing of the complainants is not a jurisdictional prerequisite to an action for violation of 29 U.S.C. § 660(c)(1). *See Marshall v. S.K. Williams, Co.,* 462 F.Supp. 722, 724 (E.D.Wis.1978); *Dunlop v. Hanover Shoe Farms, Inc.,* 441 F.Supp. 385, 387 (M.D.Pa.1976). The statutory mosaic of the Act does not expressly extend the detailed procedural investigatory scheme of the Act *in toto* to § 660(c)(1) proceedings. Nor should this procedural scheme be implied. Inherent in the very nature of retaliatory dismissals is the need for swift administrative action, and the Secretary of Labor has been given abundant flexibility in that respect. *See* 29 U.S.C. § 660(c)(2). The Secretary need only cause such investigation to be made as he deems appropriate. *See Dunlop v. Hanover Shoe Farms, Inc., supra* at 387–88. Since the Secretary need not conduct any investigation into the firing before filing a suit, *Dunlop v. Hanover Shoe Farms, Inc., supra,* at 387, it follows that the defendant has no right to a § 8(f)(1) notice before litigation commences.

Finally, the defendant cannot justifiably claim an infringement on due process rights. The trial itself is *de novo,* and defendant has all the constitutional protections that original jurisdiction in the district court implies. *Id.,* at 388. Nor can defendant make out a case for prejudice to its defense. *Cf. Donovan v. Royal Logging Co.,* 645 F.2d 822, 827 (9th Cir.1981). Since the Court finds that no statutory notice is required, prejudice by reason of delayed notification seems to be of no consequence. The Court in any event need not decide the point because, given the facts and circum-

---

22. *But cf. Burkart Randall Division of Textron, Inc. v. Marshall,* 625 F.2d 1313 (7th Cir.1980), holding that OSHA inspections, notwithstanding the statutory language, may be based on more informal complaints, and need not be in writing and-or signed by the employee.

stances of this case, a claim of prejudice appears groundless.

■ Defendant further contends that failure to notify complainants of the Secretary's determination whether or not to proceed within 90 days of receipt of the complaint of reprisal firing as set forth in 29 U.S.C. § 660(c)(3) [23] prohibits the institution and prosecution of the instant action. The Court disagrees. The manifest purpose of the language in the statute is for the benefit of the aggrieved worker, to insure prompt attention to the plight of an employee who believes that he has been fired in retaliation for his exercise of protected rights. The defendant may not pervert a statutory provision protecting employees against employer harassment in order to insulate itself against an action brought in response to a 29 U.S.C. § 660(c)(1) grievance. See *Marshall v. N.L. Industries, Inc.,* 618 F.2d 1220, 1224 (7th Cir.1980). The Court is confident that Congress carefully delimited the prescribed notification to the employees to insure a timely response by OSHA, and that the statutory omission of any like notification requirement as to the employer was a conscious legislative decision rather than the product of oversight or imprecise language. It is not for the Court to read more into an unambiguous statute than its drafters thought wise. *See Arkansas Valley Industries, Inc. v. Freeman,* 415 F.2d 713, 717 (8th Cir.1969); *Christner v. Poudre Valley Coop Association,* 235 F.2d 946, 950 (10th Cir.1956). Nor should an overly-technical reading of the statute be allowed to defeat the salutary and remedial purposes of the Act. *Marshall v. N.L. Industries, Inc., supra,* at 1225; *cf. Bristol Steel & Iron Works, Inc. v. Occupational Safety and Health Rev. Commission,* 601 F.2d 717, 721 (4th Cir.1979).

To buttress this conclusion, it should be noted that the implementing regulations promulgated by the Secretary construe the section as directory, not mandatory. 29 C.F.R. § 1977.16 (1981). The Secretary's interpretations of the Act are entitled to great weight and are controlling if reasonable. *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980). The Court concludes that the Secretary's interpretation of 29 U.S.C. § 660(c)(3) is reasonable. No bar to the suit exists. Having thus disposed of defendant's procedural arguments, the Court can now reach the merits of the case.

■ To determine if the defendant violated 29 U.S.C. § 660(c)(1), the Court must find that (i) the activities of the complainants were protected, and (ii) the employer (Freeway) cannot by a preponderance of the evidence show that it would have dismissed complainants in the absence of the protected conduct. *Marshall v. Commonwealth Aquarium,* 469 F.Supp. 690, 692 (D.Mass.), *aff'd,* 611 F.2d 1 (1st Cir.1979). *See Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

29 U.S.C. § 660(c)(1) of the Act provides:

No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

The activities protected by this section include an employee's expression of concern relative to health and safety standards, whether directed to his employer, *Donovan v. Commercial Sewing, Inc.,* No. H–81–397, slip opinion, at 7 (D.Conn. Oct. 5, 1982), or to OSHA, *Marshall v. Commonwealth Aquarium, supra,* 469 F.Supp. at 692–93. Consistent with the findings of fact enunciated above, the Court is constrained to conclude that the complainants and-or those

---

**23.** 29 U.S.C. § 660(c)(3) provides: "Within 90 days of the receipt of a complaint filed under this subsection the Secretary shall notify the complainant of his determination under paragraph (2) of this subsection."

acting at the behest of the complainants communicated grievances concerning safety and health conditions both to Freeway and to OSHA. The Court finds, as a matter of law, that the actions of the complainants in so doing constituted protected activities within the ambit of 29 U.S.C. § 660(c)(1).

■ The government has established that the complainants' activities were protected. The onus, thus, shifts to the defendant to establish by a preponderance of the evidence that the protected activities were not the substantial proximate cause for dismissal.[24]

■ The findings of fact previously discussed demonstrate that this is a classic case of retaliatory discharge. Freeway has been wholly unable to explain glaring inconsistencies in the record, including but not limited to pink slips made out for May 8 for complainants, replacements for the complainants in place at the start of work on the day of reckoning (May 10, 1978), and awarding of raises to supposedly incompetent workers. Nothing in the record worthy of credence shows that Freeway would have dismissed the complainants if they had not expressed and acted upon their concerns about working conditions. To accept any of the several versions proffered by the defendant to explain the events of May 4–10, 1978 would be to elevate fiction above fact and to sanctify a reverence for coincidence which goes beyond any acceptable level of credulity.

The Court finds that the complainants were fired for complaining to OSHA about safety and health conditions; that the firings were a direct reprisal for the conduct of protected activities; and that the dismissals constituted a willful and blatant violation of 29 U.S.C. § 660(c)(1).

It remains only for the Court to discuss and to decide the parameters of the relief to be awarded against the defendant in consequence of its aforesaid statutory violations.

The government requests injunctive relief, mandatory posting of notices to inform employees about their rights under the Act, back pay with prejudgment interest and the award of a further sum to Kuusela amounting to $25,000.[25]

■ Enjoining Freeway and those in privity with it from future violations of the Act and posting notices informing employees of this case and of their rights under the Act are appropriate remedies in order to protect Freeway's current and future employees from repetition of the discriminatory practices at issue here. *Compare Donovan v. Commercial Sewing, Inc., supra,* at 16. The injunction should also require Freeway to remove any record of the dismissals from its records and to refrain from any action that hinders complainants in obtaining work at the Naval Submarine Base or elsewhere. *Cf. Dunlop v. Carriage Carpet Co.,* 548 F.2d 139 (6th Cir.1977). Further, Freeway shall be required to post and to display prominently at its principal office and at the situs of the employee time-clock at each of the job sites on which Freeway may from time to time be working, continuously for a period of 90 days from and after date of entry of the order entered pursuant to this Opinion, a true copy of the notice appended hereto as Appendix A.

■ The government seeks payment to Kuusela of $25,000 in lieu of anticipated receipts on an alleged parol contract between Freeway and Kuusela.[26] The plaintiff's position is that the terms of the contract called for a bonus payment of $50 to

---

24. *Mt. Healthy City Board of Education v. Doyle, supra,* at 287. Even assuming that the plaintiff had to carry the burden of proof, it has done so several times over.

25. The $25,000. equals the bonus which he allegedly would have received ($50 per housing

unit, multiplied by 500 units) had he not been wrongfully discharged.

26. Reinstatement is not at issue. In any event, it is an inappropriate remedy for these complainants, given the transience of the construction business and the essentially short-term na-

Kuusela for each housing unit completed, up to a total of $25,000 for all 500 units at Nautilus Park. Kuusela testified that Clear had agreed to pay him the aforementioned bonus, but that it was not reduced to writing because Kuusela trusted Clear.[27] Clear denies the existence of the bonus pact. The Court believes that some discussions about a bonus took place between Clear and Kuusela. Kuusela admits, however, that the terms and conditions of the bonus were never outlined with any specificity, and indicates that the payment was subject to Clear's satisfaction with progress of the work. A contract requires that the parties assent to the essential terms of their obligations and that an agreement embrace these terms. See J. Koury Steel Erectors, Inc. v. San-Vel Concrete Corp., 387 A.2d 694, 697 (R.I.1978); Dorr-Oliver, Inc. v. Webster Computer Corp., 30 Conn.Supp. 544, 552, 300 A.2d 45, 50 (1972). The cursory mention of terms and conditions does not, in the Court's view, meet those criteria. There must be a meeting of the minds—and there was none as to the alleged incentive payment. Thus, plaintiff fails to sustain its burden, and the Court will not make an award based on the claimed terms of the alleged parol contract.[28]

■ The Court will, however, award back pay to all four complainants as compensation for income that would have accrued to them had they not been wrongfully dismissed. Donovan v. Commercial Sewing, Inc., supra; Marshall v. Commonwealth Aquarium, supra. The award of back pay must be reduced by the amount of any income from employment earned by com-

plainants during the period covered by the back pay award. Cf. Donovan v. Commercial Sewing, Inc., supra, at 16. The evidence is gratifyingly uncontroverted that the carpentry phase of the project at Nautilus Park ended on or about August 15, 1978. Thus, the complainants would have worked at a rate of $9.00 an hour from May 10th until August 15th, had their services not been terminated by Freeway.[29]

One complainant (Paul Robinson) had no income during the time in question, despite good-faith efforts. Thus, Robinson lost wages for a period of 14 weeks. The Court computes his back pay at $5,040.

The other complainants testified that they each found work as carpenters for Caruso Construction Company, at a wage rate of $7.00 per hour. Kuusela lost wages for three days in the week ending May 13th; and was gainfully employed thereafter, without interruption, from May 15th until after the August 15th cut-off date. Kuusela lost the $2.00 per hour wage differential, however, after resumption of work. The Court computes his back pay at $1288. The computation for each of the Pussinen brothers is the same as for Kuusela, except that the Pussinens were not hired by the successor employer until May 22nd (one week after Kuusela had started). The ongoing wage differential applies equally. The Court computes back pay for Roger Pussinen in the amount of $1568; and back pay for Leonard Pussinen in like amount.

■ The government also seeks prejudgment interest. In a case of this genre, interest is awarded at the discretion of the

---

ture of the employment for which they were retained.

27. While not fatal to the plaintiff's position, the absence of a writing increases the plaintiff's inability to meet its burden of proof on the existence and terms of the contract. See Labrecque v. Niconchuk, 442 F.2d 1094, 1097–98 (1st Cir.1971); Trimount Bituminous Products Co. v. Chittenden Trust Co., 117 N.H. 946, 950, 379 A.2d 1266, 1268 (1977).

28. If a contract did exist for an incentive bonus, the Court is satisfied that the Court has power and authority to base an award of back pay on it. Cf. Bowe v. Colgate-Palmolive Co., 489 F.2d 896, 903 (7th Cir.1973); NLRB v. Coca-Cola Bottling Co., 360 F.2d 569, 572 (5th Cir.1966); Nabors v. NLRB, 323 F.2d 686, 690 (5th Cir.1963), cert. denied, 376 U.S. 911, 84 S.Ct. 667, 11 L.Ed.2d 609 (1964).

29. The Court assumes that all complainants would have worked 40 hour weeks. No allowance is made for any possible overtime.

trial court. *Heritage Homes of Attleboro, Inc. v. Seekonk Water District,* 648 F.2d 761, 764 (1st Cir.), *vacated on other grounds,* 454 U.S. 807, 102 S.Ct. 81, 70 L.Ed.2d 76 (1981), *modified on other grounds on reh'g,* 670 F.2d 1 (1st Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982); *Lodges 743 and 1746, International Association of Machinists and Aerospace Workers v. United Aircraft Corp.,* 534 F.2d 422, 446 (2d Cir.1975), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976). Prejudgment interest is intended to compensate a party for the time value of money lost due to the wrongful dismissal. *See Heritage Homes of Attleboro, Inc. v. Seekonk Water District, supra,* 648 F.2d at 764; *accord Cargill, Inc. v. Taylor Towing Service, Inc.,* 642 F.2d 239, 242 (8th Cir. 1981).

In *Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729 (1st Cir.1982), the Court of Appeals for this Circuit recently held that, in the absence of a general federal provision on prejudgment interest, federal common law provides "[T]hat a prevailing plaintiff is entitled to prejudgment interest as an element of damages when the amount of his claim is either 'liquidated' or 'reasonably ascertainable by reference to established market values.'" *Id.,* at 741, *quoting Roth v. Fabrikant Bros.,* 175 F.2d 665, 669 (2nd Cir.1949). *Compare Jones v. U.S.,* 258 U.S. 40, 42 S.Ct. 218, 66 L.Ed. 453 (1922).

In actions brought pursuant to the Fair Labor Standards Act, the National Labor Relations Act, and Title VII, employees have been awarded prejudgment interest along with back pay. *See, e.g., Marshall v. Hope Garcia, Inc.,* 632 F.2d 1196, 1199 (5th Cir.1980); *NLRB v. Otis Hosp.,* 545 F.2d 252, 255 (1st Cir.1976); *Chastang v. Flynn & Emrich Co.,* 381 F.Supp. 1348, 1352 (D.Md.1974), *aff'd,* 541 F.2d 1040 (4th Cir. 1976).

In *Donovan v. Commercial Sewing, Inc., supra,* Senior District Judge Blumenfeld specifically awarded prejudgment interest to the victim of a reprisal discharge in an action under 29 U.S.C. § 660(c)(1). *Id.* at 15. The Court, satisfied that it has the power to do so, and cognizant of the egregious conduct of the defendant in this matter, awards prejudgment interest to the complainants. The rate of interest, absent statutory directive, is left to the court's discretion. *See Holmes v. Bateson,* 434 F.Supp. 1365, 1389 (D.R.I.1977), *aff'd in part, rev'd in part on other grounds,* 583 F.2d 565 (1st Cir.1978). The government seeks an award of 8% interest from termination to February 2, 1981, 10% from that date to June 1, 1982, and 12% to date of entry of judgment. This roughly parallels the rates from time to time specified in Rhode Island statutes for prejudgment interest. The suggested rates are, for most of the period, significantly below the interest levels exacted in the money markets by New England lenders. The Court, to compensate the complainants fairly, will adopt the recommended rates; and will add to each of the back pay awards prejudgment interest at the rates specified. The Court also awards court costs to the plaintiff.

Counsel for the plaintiff shall forthwith prepare and present for entry by the Court an order for judgment consonant with the foregoing.

APPENDIX A

NOTICE TO ALL EMPLOYEES OF FREEWAY CONSTRUCTION CO.

STOP! READ THIS!

IT MAY <u>SAVE</u> YOUR LIFE OR THE LIFE OF SOMEONE WORKING WITH YOU!!

882

1. AN EMPLOYER CAN'T FIRE, HARASS, OR REDUCE THE WAGES OF ANY WORKER WHO COMPLAINS TO THE EMPLOYER, THE STATE, OR OSHA ABOUT HEALTH OR SAFETY HAZARDS.

2. ON MAY 10th, 1978, FOUR CARPENTERS WERE FIRED BY FREEWAY FOR COMPLAINING TO OSHA ABOUT DANGERS AT A JOB IN GROTON, CONN.

3. THE UNITED STATES DISTRICT COURT ORDERED FREEWAY TO PAY THE CARPENTERS FOR ALL WAGES LOST BECAUSE THEY WERE FIRED, TOGETHER WITH INTEREST.

4. THE COURT HAS ORDERED FREEWAY TO STOP HARASSING, FIRING, OR REDUCING THE PAY OF EMPLOYEES WHO COMPLAIN ABOUT HEALTH AND SAFETY DANGERS.

5. IF YOU FEEL ENDANGERED BECAUSE OF CONDITIONS ON THE JOB, CALL OSHA AT (203) 722–2033 or (401) 528–4667. IF YOU FEEL THAT YOU HAVE BEEN BOTHERED OR DISCRIMINATED AGAINST FOR COMPLAINING ABOUT WORKING CONDITIONS, CALL OSHA AT (203) 722–2033 or (401) 528–4667.

THIS NOTICE POSTED PER ORDER OF UNITED STATES DISTRICT COURT