DECISION
This matter was tried before the Court without a jury on November 8, 2011, on Defendant's de novo appeal from a decision rendered in the Third Division District Court. Plaintiff, Home Instead Senior Care (Home Instead), alleges that Defendant, John A. Jackson, Trustee of the Beatrice J. Hayden Trust, is indebted to Plaintiff in the amount of $3,531.04 on book account for services rendered to Beatrice Hayden (Mrs. Hayden) during her lifetime. Defendant filed a Counterclaim in the District Court alleging that Plaintiff owes Mrs. Hayden $340.15 as overpayment for the services provided to her.
This Court has jurisdiction pursuant to G.L. 1956 § 8-2-17 and renders its decision in accordance with Rule 52 of the Rhode Island Superior Court Rules of Civil Procedure. For the reasons that follow, the Court finds in favor of Defendant on all counts in Plaintiff's Complaint, and finds in favor of Plaintiff on Defendant's Counterclaim. *Page 2 
 I Facts and Travel
Having heard the testimony presented by the parties and examined the exhibits admitted into evidence, the Court makes the following findings of fact.
In 2007, Mrs. Hayden, then approximately ninety years old and living independently, fell on several occasions. At that time, her friend and financial advisor, Denis Thibeault (Thibeault), was appointed to serve as her health care power of attorney and arranged to have Home Instead provide services to Mrs. Hayden which would allow her to remain at her home. Home Instead provides non-medical home care services for seniors such as companionship, transportation, light duty household cleaning, and cooking. Its employees are available around the clock to provide such services at seniors' own homes or in nursing care facilities, or for any other duration requested.
When first contacted by Thibeault, Home Instead provided Mrs. Hayden with "24/7" care, meaning a Home Instead employee would be at Mrs. Hayden's home around the clock, seven days a week. Independent as she was, Mrs. Hayden thereafter opted not to have Home Instead employees remain with her during the overnight hours, and later opted not to have any employees during daytime hours either.
Sometime thereafter, Mrs. Hayden fell and broke her hip. After receiving rehabilitative services, Mrs. Hayden returned to her home. Concerned with what he perceived to be Mrs. Hayden's weight loss and inability to care for herself, Thibeault then arranged to have Mrs. Hayden reside at an assisted living facility known as Atria or Harborhill (Harborhill), located in East Greenwich, commencing in August 2008. Thibeault again sought to retain the services of Home Instead while Mrs. Hayden was at *Page 3 
that assisted living facility to ensure that she did not suffer another fall. Having used Home Instead's services for Mrs. Hayden in the past, there was little discussion between Thibeault and any representative of Home Instead concerning the scope of services. With respect to services to be rendered while Mrs. Hayden was at Harborhill, Home Instead provided its standard form Service Agreement to Thibeault and Mrs. Hayden identifying the following services to be provided: "24/7 $345.00/weekdays, $358.00/W/E." Mrs. Hayden executed that Service Agreement on August 14, 2008. (Ex. 1.) Thibeault was the party responsible for the payment of Home Instead's invoices on behalf of Mrs. Hayden. Thibeault paid the required $4,882.00 deposit set forth in the Service Agreement and received all of Home Instead's bi-weekly invoices.
Shortly after Mrs. Hayden came to Harborhill, Thibeault sought to scale back Home Instead's coverage during daytime hours. On August 15, 2008, Thibeault called Home Instead to request that daytime coverage for Mrs. Hayden be cancelled as of August 18, 2008, but the 8 pm — 8 am overnight coverage would remain. The same day, on August 15, 2008, Home Instead's care plan supervisor, Isabel Rosa (Rosa), conferred with an unidentified staff member at Harborhill and was informed that Harborhill required that Mrs. Hayden continue with "24/7" coverage by Home Instead until she could be transferred to a different unit within the facility. The "24/7" coverage, then, remained in place.
The form Service Agreement drafted by Home Instead and provided to and signed by Mrs. Hayden allows Home Instead to fill in rates for a number of specific services, including a "per shift" and a "Weekend" rate for "Awake Overnight" services. (Ex. 1.) The handwritten reference on the Service Agreement to the "24/7" services provided to *Page 4 
Mrs. Hayden did not specify whether that included "awake overnight" services or otherwise allowed the care giver to sleep during the overnight shift. Home Instead's President and owner, Gary Leiter (Leiter), and Rosa both testified that the original "24/7" services provided to Mrs. Hayden inherently allowed for the care giver to sleep during the overnight shift. According to both Leiter and Rosa, there would be an additional fee to the "24/7" rate if a care giver was required to be awake during the overnight hours to reflect the increased demand on the care giver. The amount or imposition of this additional rate is not specified in any way on the Service Agreement drafted by Home Instead. (Ex. 1.) Rosa further testified that Harborhill, through an unidentified employee, required that Home Instead's assigned staff caring for Mrs. Hayden remain awake at all times. The date that this requirement was made known to Home Instead and/or Thibeault is disputed.
On September 17, 2008, a representative of Harborhill identified only as Monique complained to Rosa that a Home Instead employee, Barbara Casale, was asleep during her overnight shift while caring for Mrs. Hayden. Casale denied being asleep on that date. This incident is reflected on Home Instead's log which documents significant events during a client's care. (Ex. B.)
Home Instead provided services to Mrs. Hayden at Harborhill from August 8, 2008 through October 19, 2008. The invoices for those services have been introduced in full as Exhibit D. Leiter testified that the increased cost for the awake overnight was reflected as "Additional Charges/Credits" on the invoices sent to Thibeault. Each of the six bi-weekly invoices from August 8, 2008 through October 19, 2008 include "Additional Charges/Credits," which is a line item set forth on the bottom of each invoice *Page 5 
and separate from the listed rates for twenty-four hour service. (Ex. D.) The total amount of "Additional Charges/Credits" on the six invoices is $3076. (Id.) The record is bereft of any evidence that the "Additional Charges/Credits" assessed were for anything other than the increased rate for a caretaker to be awake during the overnight hours.
Thibeault paid in full the four separate invoices for services from August 8, 2008 through September 30, 2008, including the increased charges for the awake overnight, before he questioned those additional charges in October 2008. The $4,882 deposit paid was applied to the two invoices for services from October 1, 2008 through October 19, 2008. (Ex. 2.) Thibeault has not paid Home Instead for the balance due on the last two invoices because those balances largely reflect the additional charges to have Home Instead care givers remain awake during the overnight shift.
Home Instead maintains that the balance due for Mrs. Hayden's care is $3,531.04, which includes the outstanding invoices (after the deposit funds were applied) from October 1, 2008 through October 19, 2008, finance charges for late payments and collection fees in the amount of $697.40 (Ex. 2), the latter two categories being recoverable under the terms of the Service Agreement. (Ex. 1.) Defendant did not present any evidence or argument that there was a sum certain overpayment for which Plaintiff is liable.
Mrs. Hayden passed away in June 2009. A probate estate was not opened; rather, all her assets were placed into trust for the benefit of Bishop Hendricken High School, a private high school for boys in Warwick. After a Suggestion of Death was filed with the District Court and with information obtained by Defendant's counsel, Plaintiff moved to substitute the Defendant Beatrice Hayden with Brother Thomas Leto, Trustee of the *Page 6 
Beatrice J. Hayden Trust. Brother Leto has also recently been substituted as the Trustee of the Beatrice J. Hayden Trust; the Trustee is presently John A. Jackson, the President of Bishop Hendricken High School. Plaintiff did not present any evidence establishing that John A. Jackson, Trustee of the Beatrice J. Hayden Trust, is responsible for the debts of Mrs. Hayden incurred during her lifetime.[1]
 II Presentation of Witnesses
Plaintiff presented the testimony of its President and owner, Leiter, and its care plan supervisor, Rosa. Leiter testified that "24/7" did not contemplate that the assigned care giver was required to be awake throughout those services, but rather it was permissible for a care giver to sleep when the patient was sleeping. He further testified that he was aware that on September 17, 2008, an employee of Home Instead was reported as having been caught sleeping while caring for Mrs. Hayden at Harborhill. Leiter explained that that care giver, Casale, denied she was asleep not because she was prohibited from sleeping while providing "24/7" coverage, but rather because she actually was not sleeping when she was alleged to have been. Leiter's response suggested that it was well known among Home Instead employees that "24/7" allowed employees to sleep during the overnight hours while the client was sleeping. Of particular importance, Leiter testified that it was just after
that incident on September 17, 2008 that Home Instead became aware of Harborhill's requirement that Mrs. Hayden's care giver was to be awake in the overnight hours. Based upon Leiter's testimony, then, *Page 7 
the corresponding increase in the rate for awake overnight services would have started to appear on Home Instead invoices on or after September 17, 2008. The invoices submitted as evidence do not support Leiter's testimony as "Additional Charges/Credits" appeared as early as the August 8 — August 15, 2008 invoice (Ex. D), and there is no evidence that such charges were for anything other than the increased rate for awake overnight services.
Rosa testified that in 2008 she was responsible for communicating with patients, family members and/or loved ones on behalf of Home Instead concerning the scope of care to be provided. She has been employed by Home Instead for approximately nine (9) years. Although her position and responsibilities have changed over the years, since August 2008, she may have conferred with approximately 300 families each year to explain to them the scope of services and coordination of care that will be provided to their loved one. Notwithstanding this high volume of work, Rosa recalled a specific conversation with Thibeault when he sought to engage Home Instead's services while Mrs. Hayden was residing at Harborhill in which she informed him that the "24/7" care plan would allow care givers to sleep in the overnight hours, and that any awake overnight services would require an additional charge. This conversation is not reflected on Home Instead's own log. (Ex. B.) Rosa explained that the log did not necessarily include an account of all conversations involving a client.
Rosa recalled a second conversation with Thibeault in which she informed him that "24/7" was to be changed to thereafter require the care giver to be awake during the overnight hours, and that the additional fee for awake overnight services would be assessed. Rosa did not testify specifically when or where that conversation took place, *Page 8 
but did state that it would have been shortly after Thibeault was advised that Harborhill was unwilling to allow Mrs. Hayden's daytime services from Home Instead to be eliminated, which was on August 15, 2008, and a "couple of weeks" before Casale was found sleeping during the overnight hours while assigned to Mrs. Hayden's care, which was September 17, 2008. This conversation is also not reflected on Home Instead's own log. (Ex. B.)
Rosa's testimony is inconsistent with Leiter's testimony that as of Sept 17, 2008, the care givers were permitted to sleep while providing "24/7" services to Mrs. Hayden. Her testimony is also inconsistent with Home Instead's invoices, which began billing for "Additional Charges/Credits" to reflect the increased rate for awake overnight service as early as the August 8 — August 15, 2008 invoice. (Ex. D.)
Defendant relied upon the testimony of Thibeault, a financial advisor who first came to know Mrs. Hayden over twenty years ago while managing her assets. Over time, he became a full service advisor and friend to Mrs. Hayden until the time of her death. Thibeault is not a beneficiary to Mrs. Hayden's estate or to her Trust and has no financial interest in this lawsuit. Thibeault denied having either conversation with Rosa that additional fees would be assessed if and when a care giver was required to stay awake while providing "24/7" coverage. Moreover, he credibly testified that he was "flabbergasted" to learn in October 2008, when Home Instead's care for Mrs. Hayden at Harborhill was coming to an end and he was settling Mrs. Hayden's bills, that the "24/7" coverage did not include being awake. He asserted that he would have remembered if a previous discussion took place with anyone at Home Instead concerning this issue because he was so "astounded" that "24/7" did not include awake services. *Page 9 
As to paying the additional charges for the first several billing cycles, Thibeault stated that he did not carefully review all the verbiage on the bi-weekly invoices that he received on Mrs. Hayden's behalf. The Court notes that there was not an overwhelming amount of information or fine print contained on the invoices that a licensed financial advisor would be unable to comprehend, and the "Additional Charges/Credits" were readily apparent. (Ex. D.) Notwithstanding this failure to identify or question the additional charges sooner, the Court does not find that Thibeault's credibility is so diminished as to negate the balance of his testimony, or that he waived the right to contest those additional charges on Mrs. Hayden's behalf. To the contrary, Thibeault remained more credible than Plaintiff's owner and its employee, whose testimony contradicted one another and was inconsistent with the invoices submitted as evidence.
 III Standard of Review
Section 9-12-10 of the Rhode Island General Laws provides a trialde novo on appeal from a decision of the Rhode Island District Court. R.I. Gen. Laws 1956 § 9-12-10. The mere filing of the appeal to the Superior Court vacates the District Court judgment, and the appealing party has the statutory right to have a Superior Court trial justice use her judgment in passing on the merits of the case, including questions of law and fact. Val-Goia Properties, LLC v.Blamires, 18 A.3d 545, 549 (R.I. 2011).
Rule 52(a) of the Superior Court Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon." Super. Ct. R. Civ. P. 52(a). In a non-jury trial, the trial justice sits as the trier of fact as well as of law. Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). *Page 10 
"Consequently, he [or she] weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences."Id. A trial justice's findings of fact will not be disturbed unless such findings are clearly erroneous, the trial justice misconceived or overlooked material evidence, or unless the decision fails to do substantial justice between the parties. Opella v.Opella, 896 A.2d 714, 718 (R.I. 2006) (quoting Bogosian v.Bederman, 823 A.2d 1117, 1120 (R.I. 2003)). While the trial justice's analysis of the evidence and findings need not be exhaustive or "categorically accept or reject each piece of evidence," the trial justice's decision must "reasonably indicate[] that [she] exercised [her] independent judgment in passing on the weight of the testimony and credibility of the witnesses."Notarantonio v. Notarantonio, 941 A.2d 138, 144 (R.I. 2008) (quoting McBurney v. Roszknowski,875 A.2d 428, 436 (R.I. 2005)). Further, although the trial justice is required to make specific findings of fact, "[e]ven brief findings and conclusions are sufficient if they address and resolve the controlling and essential factual issues in the case."Hilley v. Lawrence, 972 A.2d 643, 651 (R.I. 2009) (quotingDonnelly v. Cowsill, 716 A.2d 742, 747 (R.I. 1998)).
 IV Analysis
The issues before this Court can be simplified as follows: whether the "24/7" coverage set forth in the Service Agreement allowed for care givers to be asleep during the overnight hours and, if so, whether there was a valid modification of the Service Agreement that requires Defendant to pay an increased rate for Home Instead's care givers to remain awake. *Page 11 
 A. The Terms of the Service Agreement Are Ambiguous
It is well-settled in contract construction that the contract must be viewed in its entirety and that contract terms are to be assigned their plain and ordinary meaning. See, e.g.,Young v. Warwick Rollermagic Skating Center, Inc.,973 A.2d 553, 558 (R.I. 2009); Rotelli v. Catanzaro,686 A.2d 91, 94 (R.I. 1996); Paradis v. Greater ProvidenceDeposit Corp., 651 A.2d 738, 741 (R.I. 1994). If the contract terms are clear and unambiguous, the task of judicial construction is at an end and the contract terms must be applied as written.Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004);Zarrella v. Minnesota Mutual Life Insurance Co.,824 A.2d 1249, 1259 (R.I. 2003); W.P. Assocs. v. Forcier,Inc., 637 A.2d 353, 356 (R.I. 1994). Whether an ambiguity exists is a question of law and is confined to the four corners of the document. Rivera, 847 A.2d at 284.
An ambiguity exists when a contract term is "reasonably and clearly susceptible of more than one interpretation." Rubery v.Downing Corp., 760 A.2d 945, 947 (R.I. 2000) (quotingRotelli, 686 A.2d at 94)). If the terms of a written contract are ambiguous, the ambiguous terms must be construed or interpreted against the party that drafted the contract. Judd Realty,Inc. v. Tedesco, 400 A.2d 952, 955 (R.I. 1979) (citingFryzel v. Domestic Credit Corp.,120 R.I. 92, 98, 385 A.2d 663, 665, 666-67 (1978)).
The Service Agreement in the instant case provides for a set fee on weekdays and on weekends for "24/7" coverage. These terms are set forth in handwriting, and it is undisputed that Mrs. Hayden executed the Service Agreement after the handwritten terms were added and that Thibeault was aware of such terms. (Ex. 1.) The typed portion of the Service Agreement provides for certain a la carte services to be provided, with rates *Page 12 
to be added as needed. (Id.) Included among those a la carte services is "Awake Overnight" that may be calculated "per shift" or for a weekend rate. (Id.) Because an "awake overnight" is specifically offered by Plaintiff as one of its many services and because the "24/7" handwritten rates do not identify whether it includes awake overnight services, the Service Agreement is reasonably and clearly susceptible of more than one meaning, namely, that "24/7" either includes awake overnight services or it allows a care giver to sleep during the overnight hours. Accordingly, this Court finds the Service Agreement to be ambiguous as it relates to "24/7" and the inclusion of awake overnight services.
Turning, then, to the construction of the ambiguous term "24/7," this Court is required to construe the ambiguous term in favor of Defendant where it is undisputed that Plaintiff was solely responsible for drafting the contract. See Judd, 400 A.2d at 955. Thus, "24/7" is construed as including awake overnight services, consistent with Thibeault's understanding and Plaintiff was not entitled to any additional fees for awake overnight services provided to Mrs. Hayden while she was at Harborhill. Accordingly, Defendant is entitled to judgment on all counts in the Complaint.
 B. Even If "24/7" Did Allow Care Givers To Sleep,Plaintiff Has Failed To Establish That The Service Agreement Was Modified
The law permits modification of contracts where the parties mutually assent to the new terms of the contract, provided that the modification does not violate the law or public policy and that the modification is supported by consideration. Fondedile, S.A.v. C.E. Maguire, Inc., 610 A.2d 87, 92 (R.I. 1992) (citingAngel v. Murray, 113 R.I. 482, 489, 322 A.2d 630, 634 (1974)). To modify an enforceable contract, the parties must *Page 13 
assent to the essential terms of their obligations and there must be an agreement embracing these terms. Id. (citingDonovan v. Freeway Construction Co.,551 F. Supp. 869 (D.R.I. 1982)). The burden of proving the existence of the modification rests with the party alleging the new contract, who must show that both parties to the contract subjectively and objectively agreed to be bound by the new contract's terms.Id. (citing In re Ewing,39 B.R. 59 (Bkrtcy D.R.I. 1984); Smith v. Boyd,553 A.2d 131, 133 (R.I. 1989)).
Even if the Service Agreement did allow for care givers to sleep in the overnight hours, Plaintiff has not demonstrated that there was a valid modification of that Service Agreement. Plaintiff alleges that Thibeault, as the party responsible for paying for Mrs. Hayden's services, was advised of the increased fee for awake overnight services that would be added to the "24/7" rates. The evidence adduced at trial, however, falls far short of establishing that Thibeault was aware of these new terms, let alone agreed to be bound by those new terms. Plaintiff presented inconsistent testimony on when Home Instead was made aware that Harborhill required awake overnight services to be provided to Mrs. Hayden. Rosa's testimony that she became aware of and advised Thibeault of this awake overnight requirement shortly after Harborhill advised Thibeault that Home Instead's day shifts on Mrs. Hayden's behalf would need to continue — which was documented as being on August 15, 2008 — is wholly inconsistent with Leiter's testimony that the awake overnight requirement was put into effect just after September 17, 2008. Moreover, the testimony of both witnesses is contrary to Home Instead's invoices which reflect added charges as of August 8, 2008. (Ex. D.) It is abundantly clear from the testimony of all three witnesses that Thibeault did not agree to an increase in fees for *Page 14 
awake overnight services as of August 8, 2008, and the more credible evidence leads this Court to conclude that Thibeault wasnever made aware of the increased fee for awake overnight services until October 2008, when he was "flabbergasted" to learn that "24/7" did not require a care giver to be awake.
Based upon the credible testimony and evidence presented by Thibeault, and discounting the inconsistent and questionable testimony presented by Plaintiff's witnesses, Plaintiff has failed to establish that Thibeault subjectively and objectively agreed to be bound by the increased fees at any time. Even if "24/7" coverage was unambiguous and/or was interpreted to allow care givers to sleep during the overnight hours as Plaintiff suggests, Plaintiff has failed to establish that there was a valid modification of the "24/7" contract term which would obligate Defendant[2] to pay a higher rate for services rendered to Mrs. Hayden. For this additional reason, Defendant is entitled to judgment on all counts in the Complaint.
 C. Defendant Has Failed To Satisfy His Burden On HisCounterclaim
Although set forth in the District Court as Defendant's Counterclaim, there was no evidence presented upon which this Court could render a decision that Defendant is entitled to a sum certain from Plaintiff as an overpayment for services rendered to Mrs. Hayden.[3] Accordingly, Plaintiff is entitled to judgment on Defendant's Counterclaim. *Page 15 
 V Conclusion
For these reasons, the Court grants judgment in favor of Defendant on all counts in Plaintiff's Complaint, and grants judgment in favor of Plaintiff on Defendant's Counterclaim. Counsel for Defendant shall prepare judgments consistent with this Decision.
[1] At the close of Plaintiff's case-in-chief, Defendant moved for dismissal pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, based upon Plaintiff's failure to demonstrate that the Trustee of Mrs. Hayden's Trust is responsible for her debts. Notably, Defendant's motion was more appropriately considered pursuant to Rule 52(c) as this case was tried without a jury. The Court reserved ruling on Defendant's motion.
[2] Based upon this conclusion, this Court deems it unnecessary to rule upon Defendant's motion that Plaintiff failed to prove that the Trustee of the Beatrice J. Hayden Trust is liable for the debts incurred by Mrs. Hayden during her lifetime.
[3] Indeed, had Defendant pressed this Counterclaim and sought to be compensated for any overpayment on Mrs. Hayden's behalf, it would have been contrary to the position taken earlier that the Trustee of the Beatrice J. Hayden Trust is not liable for the debts incurred by Mrs. Hayden during her lifetime. It stands to reason, then, that the Trustee abandoned the Counterclaim previously raised by Mrs. Hayden in the District Court.

 *Page 1