322 A.2d 630.

ALFRED L. ANGEL et al. vs. JOHN E. MURRAY, JR., *Director of Finance of the City of Newport, et al.*

JULY 22, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

ROBERTS, C. J. This is a civil action brought by Alfred L. Angel and others against John E. Murray, Jr., Director of Finance of the City of Newport, the city of Newport, and James L. Maher, alleging that Maher had illegally been paid the sum of $20,000 by the Director of Finance and praying that the defendant Maher be ordered to repay the city such sum. The case was heard by a justice of the Superior Court, sitting without a jury, who entered a judgment ordering Maher to repay the sum of $20,000 to the city of Newport. Maher is now before this court prosecuting an appeal.

The record discloses that Maher has provided the city of Newport with a refuse-collection service under a series of five-year contracts beginning in 1946. On March 12, 1964, Maher and the city entered into another such contract for a period of five years commencing on July 1, 1964, and terminating on June 30, 1969. The contract provided, among other things, that Maher would receive $137,000 per year in return for collecting and removing all combustible and noncombustible waste materials generated within the city.

In June of 1967 Maher requested an additional $10,000 per year from the city council because there had been a substantial increase in the cost of collection due to an unexpected and unanticipated increase of 400 new dwelling units. Maher's testimony, which is uncontradicted, indicates the 1964 contract had been predicated on the fact that since 1946 there had been an average increase of 20 to 25 new dwelling units per year. After a public meeting of the city council where Maher explained in detail the reasons for his request and was questioned by members

of the city council, the city council agreed to pay him an additional $10,000 for the year ending on June 30, 1968. Maher made a similar request again in June of 1968 for the same reasons, and the city council again agreed to pay an additional $10,000 for the year ending on June 30, 1969.

The trial justice found that each such $10,000 payment was made in violation of law. His decision, as we understand it, is premised on two independent grounds. First, he found that the additional payments were unlawful because they had not been recommended in writing to the city council by the city manager. Second, he found that Maher was not entitled to extra compensation because the original contract already required him to collect all refuse generated within the city and, therefore, included the 400 additional units. The trial justice further found that these 400 additional units were within the contemplation of the parties when they entered into the contract. It appears that he based this portion of the decision upon the rule that Maher had a preexisting duty to collect the refuse generated by the 400 additional units, and thus there was no consideration for the two additional payments.

## I.

The first ground upon which the trial justice appears to have based his decision is that the action of the city council in amending the 1964 contract so as to provide for the additional compensation violated §9-23 of the Charter of the City of Newport. Generally, §9-23 of the charter mandates that the purchase of or contract for supplies, materials, or equipment shall be on the basis of competitive bidding and that all contracts in which the amount involved exceeds $1,000 shall be awarded to the lowest responsible bidder after public notice, and gives the council power to reject all bids and to advertise for new bids. Said §9-23 goes on to provide specifically:

"Alterations in any contract entered into may be made when authorized by the council on the written recommendation of the manager."

The record discloses that the original contract for refuse collection executed in 1964 was awarded after full compliance with the bidding provisions of §9-23. It is, however, also clear that neither award for additional compensation was made on the basis of a written recommendation therefor by the city manager. The trial justice found specifically that the pertinent language of §9-23 constitutes a limitation on the authority of the city council to amend an existing contract in that this section mandates that the authority to amend an existing contract can be exercised only when such action is recommended in writing by the city manager.

We are unable to agree. A literal reading of the pertinent provision of §9-23 does appear to give the city manager power to prevent the city council from amending an existing contract, however comprehensive might be the city council's knowledge of the compelling need for such an amendment. However, in *Rhode Island Consumers' Council* v. *Public Utilities Commission,* 107 R. I. 284, 267 A.2d 404 (1970), we reiterated our well-settled rule of statutory construction that this court will not undertake to read an enactment literally if to do so would result in attributing to the Legislature an intention that is contradictory of or inconsistent with the evident purposes of the act. We have consistently subscribed to the principle that a legislative enactment should be given what appears to be the meaning most consistent with its policy or obvious purposes. *Mason* v. *Bowerman Bros.,* 95 R. I. 425, 187 A.2d 772 (1963); *Zannelli* v. *DiSandro,* 84 R. I. 76, 121 A.2d 652 (1956). These rules of statutory construction, in our opinion, apply also when this court is called upon to construe the provisions of a municipal charter. After

closely scrutinizing the provisions of the charter in the light of the above-stated rule, we conclude that, in adopting the pertinent provision of §9-23 of the charter, the people of Newport did not intend therein to limit in any way the authority of the city council to amend an existing contract.

In the first place, the charter makes clear the supremacy of the city council in the exercise of all of the powers of the city. The provision of §1-2 of the charter grants the city comprehensive powers, both express and implied. Section 1-1 thereof provides that "* * * all powers of the city shall be vested in an elective council, hereinafter referred to as 'the council,' which shall enact local legislation, adopt budgets, determine policies, and appoint the city manager, who shall execute the laws and administer the government of the city." The power to appoint or engage a city manager is provided for in §5-1 of the charter, which also provides that "[t]he relationship between the city and the city manager shall be contractual and not that between a municipality and a civil officer." The power to remove the city manager from office is vested in the city council by the provisions of §5-2, and in *Nugent ex rel. Beck* v. *Leys,* 88 R. I. 446, 454-55, 149 A.2d 716. 721 (1959), we held that under the Newport charter "* * * the people of Newport intended that the city manager should be an employee, as distinguished from a civil officer, and could be removed at the pleasure of the council." In *Nugent* this court held: "Nowhere in the charter is there any language which persuades us that the status of the relator is anything but that of a mere employee subject to engagement and removal by the council in accordance with the procedure set forth in secs. 5-1 and 2." *Id.* at 455, 149 A.2d at 721. The concept of intellectual consistency inhibits our subscribing to the view that the people of Newport intended to confer on the city manager a power to

thwart the city council in the matter of amending existing contracts and at the same time in the same charter deny him even minimal tenure in his employment.

We are persuaded, then, that in adopting the charter, the people intended to make the city manger an administrative arm of the city council and to charge him with the performance of such duties as could more conveniently be performed by him than by the city council. It is obvious that the charter contemplates that the city manager, pursuant to the provisions of §5-4, will be kept fully informed by the various municipal departments of the status of their operational affairs and of the financial condition of the city. In such circumstances he ordinarily would be aware of conditions that would warrant his bringing to the attention of the city council the need for the alteration of an existing contract in the city's interest. Thus, in adopting §9-23 the people intended to require the city manager to make recommendations to the city council for action but not to preclude the city council from acting on its own where the circumstances would warrant such action. See Angel v. City of Newport, 109 R. I. 558, 288 A.2d 498 (1972). We, therefore, conclude that §9-23 does not operate to limit the authority of the city council to amend an existing contract.

## II.

Having found that the city council had the power to modify the 1964 contract without the written recommendation of the city manager, we are still confronted with the question of whether the additional payments were illegal because they were not supported by consideration.

### —A—

As previously stated, the city council made two $10,000 payments. The first was made in June of 1967 for the year beginning on July 1, 1967, and ending on June 30, 1968.

Thus, by the time this action was commenced in October of 1968, the modification was completely executed. That is, the money had been paid by the city council, and Maher had collected all of the refuse. Since consideration is only a test of the enforceability of executory promises, the presence or absence of consideration for the first payment is unimportant because the city council's agreement to make the first payment was fully executed at the time of the commencement of this action. *See Salvas* v. *Jussaume,* 50 R. I. 75, 145 A. 97 (1929); *Young Foundation Corp.* v. *A. E. Ottaviano, Inc.,* 29 Misc.2d 302, 216 N.Y.S.2d 448, *aff'd* 15 A.D.2d 517, 222 N.Y.S.2d 685 (1961); *Sloan* v. *Sloan,* 66 A.2d 799 (D.C. Mun. Ct.App. 1949); *Hines* v. *Ward Baking Co.,* 155 F.2d 257 (7th Cir. 1946); *Julian* v. *Gold,* 214 Cal. 74, 3 P.2d 1009 (1931); 1 Williston, *Contracts* §130A at 543 (Jaeger 3d ed. 1957); Simpson, *Contracts* §58 at 102 (2d ed. 1965). However, since both payments were made under similar circumstances, our decision regarding the second payment (Part B, *infra*) is fully applicable to the first payment.

—B—

It is generally held that a modification of a contract is itself a contract, which is unenforceable unless supported by consideration. *See* Simpson, *supra,* §93. In *Rose* v. *Daniels,* 8 R. I. 381 (1866), this court held that an agreement by a debtor with a creditor to discharge a debt for a sum of money less than the amount due is unenforceable because it was not supported by consideration.

*Rose* is a perfect example of the preexisting duty rule. Under this rule an agreement modifying a contract is not supported by consideration if one of the parties to the agreement does or promises to do something that he is legally obligated to do or refrains or promises to refrain from doing something he is not legally privileged to do,

*See* Calamari & Perillo, *Contracts* §60 (1970); 1A Corbin, *Contracts* §§171-72 (1963); 1 Williston, *supra*, §130; Annot., 12 A.L.R.2d 78 (1950). In *Rose* there was no consideration for the new agreement because the debtor was already legally obligated to repay the full amount of the debt.

Although the preexisting duty rule is followed by most jurisdictions, a small minority of jurisdictions, Massachusetts, for example, find that there is consideration for a promise to perform what one is already legally obligated to do because the new promise is given in place of an action for damages to secure performance. *See Swartz* v. *Lieberman*, 323 Mass. 109, 80 N.E.2d 5 (1948); *Munroe* v. *Perkins*, 26 Mass. (9 Pick.) 298 (1830). *Swartz* is premised on the theory that a promisor's forbearance of the power to breach his original agreement and be sued in an action for damages is consideration for a subsequent agreement by the promisee to pay extra compensation. This rule, however, has been widely criticized as an anomaly. *See* Calamari & Perillo, *supra*, §61; Annot., 12 A.L.R.2d 78, 85-90 (1950).

The primary purpose of the preexisting duty rule is to prevent what has been referred to as the "hold-up game." *See* 1A Corbin, *supra*, §171. A classic example of the "hold-up game" is found in *Alaska Packers' Ass'n* v. *Domenico*, 117 F. 99 (9th Cir. 1902). There 21 seamen entered into a written contract with Domenico to sail from San Francisco to Pyramid Harbor, Alaska. They were to work as sailors and fishermen out of Pyramid Harbor during the fishing season of 1900. The contract specified that each man would be paid $50 plus two cents for each red salmon he caught. Subsequent to their arrival at Pyramid Harbor, the men stopped work and demanded an additional $50. They threatened to return to San Francisco if Domenico did not agree to their demand. Since it was

impossible for Domenico to find other men, he agreed to pay the men an additional $50. After they returned to San Francisco, Domenico refused to pay the men an additional $50. The court found that the subsequent agreement to pay the men an additional $50 was not supported by consideration because the men had a preexisting duty to work on the ship under the original contract, and thus the subsequent agreement was unenforceable.

Another example of the "hold-up game" is found in the area of construction contracts. Frequently, a contractor will refuse to complete work under an unprofitable contract unless he is awarded additional compensation. The courts have generally held that a subsequent agreement to award additional compensation is unenforceable if the contractor is only performing work which would have been required of him under the original contract. *See, e.g., Lingenfelder* v. *Wainwright Brewing Co.*, 103 Mo. 578, 15 S.W. 844 (1891), which is a leading case in this area. *See also* cases collected in Annot., 25 A.L.R. 1450 (1923), supplemented by Annot., 55 A.L.R. 1333 (1928), and Annot., 138 A.L.R. 136 (1942); *cf. Ford & Denning* v. *Shepard Co.*, 36 R. I. 497, 90 A. 805 (1914).

These examples clearly illustrate that the courts will not enforce an agreement that has been procured by coercion or duress and will hold the parties to their original contract regardless of whether it is profitable or unprofitable. However, the courts have been reluctant to apply the pre-existing duty rule when a party to a contract encounters unanticipated difficulties and the other party, not influenced by coercion or duress, voluntarily agrees to pay additional compensation for work already required to be performed under the contract. For example, the courts have found that the original contract was rescinded, *Linz* v. *Schuck*, 106 Md. 220, 67 A. 286 (1907); abandoned, *Connelly* v. *Devoe*, 37 Conn. 570 (1871), or waived,

*Michaud* v. *MacGregor,* 61 Minn. 198, 63 N.W. 479 (1895).

Although the preexisting duty rule has served a useful purpose insofar as it deters parties from using coercion and duress to obtain additional compensation, it has been widely criticized as a general rule of law. With regard to the preexisting duty rule, one legal scholar has stated: "There has been a growing doubt as to the soundness of this doctrine as a matter of social policy. * * * In certain classes of cases, this doubt has influenced courts to refuse to apply the rule, or to ignore it, in their actual decisions. Like other legal rules, this rule is in process of growth and change, the process being more active here than in most instances. The result of this is that a court should no longer accept this rule as fully established. It should never use it as the major premise of a decision, at least without giving careful thought to the circumstances of the particular case, to the moral deserts of the parties, and to the social feelings and interests that are involved. It is certain that the rule, stated in general and all-inclusive terms, is no longer so well-settled that a court must apply it though the heavens fall." 1A Corbin, *supra,* §171; *see also* Calamari & Perillo, *supra,* §61.

The modern trend appears to recognize the necessity that courts should enforce agreements modifying contracts when unexpected or unanticipated difficulties arise during the course of the performance of a contract, even though there is no consideration for the modification, as long as the parties agree voluntarily.

Under the Uniform Commercial Code, §2-209(1), which has been adopted by 49 states, "[a]n agreement modifying a contract [for the sale of goods] needs no consideration to be binding." *See* G. L. 1956 (1969 Reenactment) §6A-2-209(1). Although at first blush this section appears to validate modifications obtained by coercion and duress, the comments to this section indicate that a modification

under this section must meet the test of good faith imposed by the Code, and a modification obtained by extortion without a legitimate commercial reason is unenforceable.

The modern trend away from a rigid application of the preexisting duty rule is reflected by §89D(a) of the American Law Institute's Restatement Second of the Law of Contracts,[1] which provides: "A promise modifying a duty under a contract not fully performed on either side is binding (a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made * * *."

We believe that §89D(a) is the proper rule of law and find it applicable to the facts of this case.[2] It not only prohibits modifications obtained by coercion, duress, or extortion but also fulfills society's expectation that agreements entered into voluntarily will be enforced by the

---

[1]The first nine chapters of the Restatement Second of the Law of Contracts were given tentative approval by the American Law Institute at successive meetings from 1964 to 1972. These chapters, which include §§1-255, were published by the Institute in 1973 in a hard-cover edition. Herbert Wechsler, Director of the Institute, in a foreword to this edition indicates that although these sections are still tentative and await final approval, it is unlikely that any further changes will be made.

[2]The fact that these additional payments were made by a municipal corporation rather than a private individual does not, in our opinion, affect the outcome of this case. Unlike many other jurisdictions, there is no constitutional or statutory restriction in this state limiting the power of a city or town to award extra compensation to a private contractor. See, e.g., McGovern v. City of New York, 234 N.Y. 377, 138 N.E. 26 (1923); Annot., 25 A.L.R. 1450 (1923), supplemented by Annot., 55 A.L.R. 1333 (1928), and Annot., 138 A.L.R. 136 (1942). Absent such limitation, a city or town may modify an existing contract in precisely the same manner as a private individual as long as the modification is reasonable and proper. See Arnold v. Mayor of Pawtucket, 21 R. I. 15, 19, 41 A. 576, 578 (1898).

courts.[3] *See generally* Horwitz, *The Historical Foundations of Modern Contract Law,* 87 Harv. L. Rev. 917 (1974). Section 89D(a), of course, does not compel a modification of an unprofitable or unfair contract; it only enforces a modification if the parties voluntarily agree and if (1) the promise modifying the original contract was made before the contract was fully performed on either side, (2) the

---

[3]The drafters of §89D(a) of the Restatement Second of the Law of Contracts use the following illustrations in comment (b) as examples of how this rule is applied to certain transactions:

"1. By a written contract A agrees to excavate a cellar for B for a stated price. Solid rock is unexpectedly encountered and A so notifies B. A and B then orally agree that A will remove the rock at a unit price which is reasonable but nine times that used in computing the original price, and A completes the job. B is bound to pay the increased amount.

"2. A contracts with B to supply for $300 a laundry chute for a building B has contracted to build for the government for $150,000. Later A discovers that he made an error as to the type of material to be used and should have bid $1,200. A offers to supply the chute for $1,000, eliminating overhead and profit. After ascertaining that other suppliers would charge more, B agrees. The new agreement is binding.

"3. A is employed by B as a designer of coats at $90 a week for a year beginning November 1 under a written contract executed September 1. A is offered $115 a week by another employer and so informs B. A and B then agree that A will be paid $100 a week and in October execute a new written contract to that effect, simultaneously tearing up the prior contract. The new contract is binding.

"4. A contracts to manufacture and sell to B 2,000 steel roofs for corn cribs at $60. Before A begins manufacture a threat of a nation-wide steel strike raises the cost of steel about $10 per roof, and A and B agree orally to increase the price to $70 per roof. A thereafter manufactures and delivers 1,700 of the roofs, and B pays for 1,500 of them at the increased price without protest, increasing the selling price of the corn cribs by $10. The new agreement is binding.

"5. A contracts to manufacture and sell to B 100,000 castings for lawn mowers at 50 cents each. After partial delivery and after B has contracted to sell a substantial number of lawn mowers at a fixed price, A notifies B that increased metal costs require that the price be increased to 75 cents. Substitute castings are available at 55 cents, but only after several months delay. B protests but is forced to agree to the new price to keep its plant in operation. The modification is not binding."

underlying circumstances which prompted the modification were unanticipated by the parties, and (3) the modification is fair and equitable.

The evidence, which is uncontradicted, reveals that in June of 1968 Maher requested the city council to pay him an additional $10,000 for the year beginning on July 1, 1968, and ending on June 30, 1969. This request was made at a public meeting of the city council, where Maher explained in detail his reasons for making the request. Thereafter, the city council voted to authorize the Mayor to sign an amendment to the 1954 contract which provided that Maher would receive an additional $10,000 per year for the duration of the contract. Under such circumstances we have no doubt that the city voluntarily agreed to modify the 1964 contract..

Having determined the voluntariness of this agreement, we turn our attention to the three criteria delineated above. First, the modification was made in June of 1968 at a time when the five-year contract which was made in 1964 had not been fully performed by either party. Second, although the 1964 contract provided that Maher collect all refuse generated within the city, it appears this contract was premised on Maher's past experience that the number of refuse-generating units would increase at a rate of 20 to 25 per year. Furthermore, the evidence is uncontradicted that the 1967-1968 increase of 400 units "went beyond any previous expectation." Clearly, the circumstances which prompted the city council to modify the 1964 contract were unanticipated.[4] Third, although the

[4]The trial justice found that sec. 2(a) of the 1964 contract precluded Maher from recovering extra compensation for the 400 additional units. Section 2(a) provided: *"The Contractor, having made his proposal after his own examinations and estimates, shall take all responsibility for, and bear, any losses resulting to him in carrying out the contract;* and shall assume the defence of, and hold the City, its agents and employees

evidence does not indicate what proportion of the total this increase comprised, the evidence does indicate that it was a "substantial" increase. In light of this, we cannot say that the council's agreement to pay Maher the $10,000 increase was not fair and equitable in the circumstances.

The judgment appealed from is reversed, and the cause is remanded to the Superior Court for entry of judgment for the defendants.

*Vernon A. Harvey*, for plaintiffs.

*Moore, Virgadamo, Boyle & Lynch, Ltd., Jeremiah C. Lynch, Jr.*, for defendants.

---

harmless from all suits and claims arising from the use of any invention, patent, or patent rights, material, labor or implement, by or from any act, omission or neglect of, the Contractor, his agents or employees, in carrying out the contract." (Emphasis added). The trial justice, quoting the italicized portion of sec. 2(a), found that this section required that any losses incurred in the performance of the contract were Maher's responsibility. In our opinion, however, the trial justice overlooked the thrust of sec. 2(a) when read in its entirety.

It is clearly a contractual provision requiring the contractor to hold the city harmless and to defend it in any litigation arising out of the performance of his obligations under the contract, whether a result of affirmative action or some omission or neglect on the part of Maher or his agents or employees. We are persuaded that the portion of sec. 2(a) specifically referred to by the court refers to losses resulting to Maher from some action or omission on the part of his own agents or employees. It cannot be disputed, however, that any losses that resulted from an increase in the cost of collecting from the increased number of units generating refuse in no way resulted from any action on the part of either Maher or his employees. Rather, whatever losses he did entail by reason of the requirement of such extra collection resulted from actions completely beyond his control and thus unanticipated.