January 16, 2024

**Supreme Court**

No. 2022-42-Appeal.
(PC 12-6232)

Jordan Nissensohn, Administrator of  :
  the Estate of Michael Nissensohn

v.                                   :

CharterCARE Home Health Services     :
  a/k/a Roger Williams Medical
        Center, et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or Email opinionanalyst@courts.ri.gov of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Jordan Nissensohn, Administrator of :
  the Estate of Michael Nissensohn

             v.          :

CharterCARE Home Health Services :
  a/k/a Roger Williams Medical
       Center, et al.

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.** The plaintiff, Jordan Nissensohn,

Administrator of the Estate of Michael Nissensohn,[1] appeals from a judgment of the

Superior Court entered in favor of the defendants, University Medical Group

(UMG), Alan Epstein, M.D., and Steven Sepe, M.D. (collectively the UMG

defendants), granting summary judgment in their favor. The plaintiff asserts that the

Superior Court erred by finding that: (1) the plaintiff did not engage in protected

conduct under the Rhode Island Whistleblowers' Protection Act (RIWPA), G.L.

---

[1] Michael Nissensohn, M.D., litigated this case until his death in March 2023. This Court granted a motion to substitute Jordan Nissensohn, Administrator of the Estate of Dr. Nissensohn, as the appellant on August 23, 2023. Throughout this opinion, we refer to Dr. Nissensohn and Jordan Nissensohn, Administrator of the Estate of Dr. Nissensohn, interchangeably as plaintiff. No disrespect is intended.

1956 chapter 50 of title 28; (2) Dr. Epstein and UMG's allegedly defamatory statements were substantially true or were made outside of the statute of limitations; (3) teaching was not covered by the plain language of the plaintiff's employment agreement; (4) the breach-of-contract claim was preempted by the Payment of Wages Act, G.L. 1956 chapter 14 of title 28; (5) the plaintiff failed to establish his claim for tortious interference with contractual relations; (6) Dr. Epstein's alleged interference was not causally connected to the plaintiff's failure to set up a new practice; and (7) the plaintiff did not provide sufficient nonhearsay evidence to support his conversion claim. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## Facts and Travel

The plaintiff, Michael Nissensohn, M.D., began working for UMG as a gastroenterologist in 2003. His employment was governed by a Physician Employment Agreement with UMG. Pursuant to the agreement, plaintiff was "employed on a full-time basis actively to practice medicine, provide medical education and/or conduct biomedical research on behalf of [UMG] * * *." He was required to devote "[forty] hours per week of clinical patient hours inclusive of teaching and administrative activities."

During plaintiff's tenure, he was supervised by Dr. Epstein, the head of the gastroenterology division. The plaintiff shared teaching responsibilities with the

- 2 -

other doctors in gastroenterology. To offset the burden of these responsibilities, Dr. Epstein secured administrative money from the hospital each year with the understanding that the gastroenterology doctors would split this so-called "teaching money" between the four of them. Nevertheless, from "almost day one," plaintiff took issue with the discrepancies between the amount of "teaching money" that Dr. Epstein promised and the amount that plaintiff actually received.

The plaintiff further clashed with Dr. Epstein when he requested a brief leave of absence from work. The plaintiff was depressed and told Dr. Epstein that, "[i]f I don't get better, I am going to McLean Hospital."[2] Subsequently, a rumor spread that plaintiff had attempted suicide and had been involuntarily committed to McLean Hospital.[3] The plaintiff was informed that the rumor originated in the UMG endoscopy unit. At this time, plaintiff suspected that Dr. Epstein was in an inappropriate relationship with the head endoscopy nurse, Audrey Kennedy. Accordingly, believing that Dr. Epstein shared information regarding plaintiff's mental health with Ms. Kennedy, plaintiff confronted Dr. Epstein. According to plaintiff, Dr. Epstein confirmed that he was the source of the information.

At some point during his tenure, plaintiff obtained a permit to carry a concealed weapon. The plaintiff began showing doctors and other employees his

---

[2] McLean Hospital is a mental health facility within Mass General Brigham.
[3] The plaintiff denied that these rumors were true; nevertheless, it was undisputed that these rumors existed.

shooting targets "to spur interest in the sport." He also began carrying his firearm into the hospital. Some UMG employees knew that plaintiff brought his firearm to work, but Dr. Epstein and Dr. Sepe, the Chief of Medicine, were not aware of that fact.

In February 2012, plaintiff met with Kenneth Belcher, the hospital CEO, and Dr. Sepe to discuss his unhappiness with Dr. Epstein. The plaintiff reported Dr. Epstein's disclosure of his mental health information, anger issues, inappropriate relationship with Ms. Kennedy, and inconsistent promises regarding "teaching money." Mr. Belcher agreed that Dr. Epstein's behavior was inappropriate and that plaintiff should have a follow-up meeting with Dr. Sepe.

On March 29, 2012, plaintiff met with Dr. Sepe and Dr. Epstein. They discussed plaintiff's issues with Dr. Epstein. The meeting was productive, and plaintiff believed the matter was resolved. However, the next day, Jodi Siegelman, a physician's assistant, who was supervised by plaintiff and Dr. Epstein, reported an incident regarding plaintiff. She reported to Merritt Brown, CEO of UMG, that about two weeks earlier, plaintiff "came into [her] office, showed [her] three carboard bulls eye targets with shots clearly fired into them and claimed that these were depictions of Dr. Epstein, including how they were supposed to be [his] head, heart, and eyes."

The plaintiff conceded that he may have shown Ms. Siegelman a target, but he denied telling her that the display depicted Dr. Epstein. Ms. Siegelman told her mother and another physician's assistant about the alleged incident. She hesitated to relate the incident to anyone else because she was new at UMG, but she eventually told Karen Romano, the office manager. Ms. Romano subsequently informed Dr. Epstein.

Doctor Epstein immediately went to Ms. Siegelman and asked her to explain what happened, promising her that it would not impact her job. That same day, Ms. Siegelman sent her report to Mr. Brown, and Dr. Epstein informed Dr. Sepe of the incident. Doctor Sepe contacted the hospital and met that afternoon with Dr. Epstein, Mr. Brown, the hospital human resources department, and the hospital's attorney to discuss the Siegelman report. After the director of human resources informed Mr. Belcher of the situation, he called the Providence Police Department and was advised that the hospital should take the report seriously. The police wanted to speak with plaintiff as soon as possible and agreed to approach him during his next scheduled shift, the following Tuesday.

The next Tuesday, April 3, 2012, plaintiff arrived at work and went straight to the endoscopy suite. He had his loaded firearm with him. At approximately 8:00 a.m., plaintiff was told that there was an emergency and that Mr. Belcher needed to

see him. He stowed his firearm in his briefcase, put the briefcase under the desk, and went to the lobby.

When plaintiff entered the lobby, two police officers approached him and asked him if he was Dr. Nissensohn. When he said yes, the officers pushed him against the wall, spread his legs, and conducted a pat-down. During the pat-down, the officers found an empty holster. They asked him if he was carrying a firearm, and plaintiff responded no. The plaintiff directed the officers to remove his wallet so that they could see his permit. He falsely informed the officers that his firearm was locked in his car.

The officers took plaintiff to an office where Mr. Belcher, Dr. Sepe, and members of the human resources department were waiting. The officers asked plaintiff again if he had a firearm, which he again denied. The plaintiff was informed that the hospital had a no-firearm policy, and, at some point, one of the officers left to search plaintiff's endoscopy suite for the firearm. The officer discovered plaintiff's loaded firearm in his briefcase in his office and returned to the meeting. Mr. Belcher informed plaintiff that he was not allowed to return to his patients, and the officers escorted him off the premises. Later that day, Dr. Sepe sent plaintiff a letter informing him that UMG was placing him on paid administrative leave. Doctor Sepe further instructed plaintiff to contact the Physicians Health Program to

set up an appointment. While plaintiff was on leave, Dr. Epstein performed plaintiff's scheduled procedures and billed plaintiff's patients directly.

The next day, plaintiff was served with a no-trespass order. He subsequently sent Mr. Brown an email asking him to lift the order. The plaintiff wanted the return of some personal items, including a laptop, which he had left in his office. However, plaintiff testified that, when his attorney went to retrieve his laptop, his attorney was informed that he was not allowed to have it back. However, after some delay, the laptop was returned.

The plaintiff maintained that during his leave, he kept receiving requests from Dr. Sepe for further psychological evaluations. He met with three forensic psychiatrists and a psychologist. Despite his compliance, the letters that plaintiff received in response were "unpleasant" and were interpreted by plaintiff as "being indicative that they were going to terminate" his employment. Two weeks after the April 3 incident, the human resources manager informed plaintiff that his leave was being extended. Subsequently, plaintiff resigned.

The plaintiff's resignation letter provided that he would "resume and continue [his] practice at 50 Summerfield Street, Fall [R]iver, Massachusetts." The Fall River address was a temporary drop-off location where patients could send their records. His patients were informed of his new mailing address should they wish to make contact. However, several patients emailed plaintiff representing that they had

received conflicting information about his whereabouts. Specifically, they stated that UMG or Dr. Epstein informed them that plaintiff was on administrative leave, that he was no longer affiliated with UMG, or that he had gone back to Fall River. The plaintiff did not reply to his patients' emails because he was "too upset to respond * * *." He subsequently decided to "never get up and running again because of the trauma from [the] whole thing."

On December 4, 2012, plaintiff filed his original complaint against the UMG defendants as well as CharterCARE Home Health Services a/k/a Roger Williams Medical Center; CharterCARE Health Partners, and Mr. Belcher (collectively the hospital defendants). On October 16, 2017, plaintiff filed an amended complaint. The amended complaint asserted eight counts: (1) intentional infliction of emotional distress against the hospital defendants; (2) defamation against Dr. Epstein; (3) defamation against UMG; (4) breach-of-contract against UMG; (5) tortious interference with prospective business relations and contractual relations against Dr. Epstein; (6) false imprisonment against the hospital defendants; (7) conversion against CharterCARE Home Health Services a/k/a Roger Williams Medical Center, CharterCARE Health Partners, and UMG; and (8) constructive discharge/violations of the RIWPA against UMG.[4]

---

[4] The amended complaint contained two additional claims: one for breach-of-contract arising out of UMG's failure to pay plaintiff for patient care and another for constructive discharge and violations of the RIWPA. Although plaintiff asserted a

Thereafter, the UMG defendants filed a motion for summary judgment. In a subsequent bench decision, the trial justice granted the UMG defendants' motion for summary judgment as to each remaining count of plaintiff's amended complaint.[5] The trial justice granted summary judgment as to plaintiff's defamation claims because some of the alleged defamatory statements were made outside of the statute of limitations and the remaining statements were substantially true or were protected by a qualified privilege. Summary judgment as to plaintiff's breach-of-contract claim was granted because plaintiff's teaching duties were voluntary and because plaintiff's claim for unpaid wages was required to be brought under the Payment of Wages Act. Therefore, his claim, although styled as one for breach-of-contract, was barred by the applicable statute of limitations pursuant to § 28-14-19.2(g) and § 28-14-20(a). The trial justice found that plaintiff's claim for tortious interference with prospective business relations failed because he did not demonstrate that Dr. Epstein's comments to plaintiff's former patients were causally connected to plaintiff's failure to resume his practice.

---

breach-of-contract claim against UMG as part of his original complaint, the original claim was solely for UMG's failure to compensate him for teaching money. When plaintiff amended his complaint, he added another claim based on UMG's failure to compensate him for patient care.

[5] Concurrent with the UMG defendants' motion for summary judgment, the hospital defendants filed their own motion for summary judgment. However, before the trial justice ruled on the hospital defendants' motion, they reached a settlement agreement with plaintiff, leaving only the UMG defendants' motion to be decided.

Summary judgment was granted as to plaintiff's conversion claim because plaintiff provided no competent evidence that he, or his attorney, had demanded his laptop's return. The trial justice granted summary judgment as to plaintiff's RIWPA claim because plaintiff testified that he believed he was reporting Dr. Epstein for unethical, but not unlawful, conduct. The trial justice reasoned that the RIWPA requires a reporter to hold a good-faith belief that the conduct said reporter is reporting is illegal. Because plaintiff did not hold such a belief, he was not protected by the RIWPA. Final judgment entered in favor of the UMG defendants on October 21, 2021. The plaintiff filed a timely notice of appeal.

**Standard of Review**

"This Court reviews a decision granting a party's motion for summary judgment *de novo*." *Citizens Bank, N.A. v. Palermo*, 247 A.3d 131, 133 (R.I. 2021) (quoting *Boudreau v. Automatic Temperature Controls, Inc.*, 212 A.3d 594, 598 (R.I. 2019)). We assess the matter "from the vantage point of the trial justice[,] * * * view[ing] the evidence in the light most favorable to the nonmoving party, and if we conclude that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law, we will affirm * * *." *Id.* (quoting *Boudreau*, 212 A.3d at 598). "Although summary judgment is recognized as an extreme remedy, * * * to avoid summary judgment the burden is on the nonmoving

- 10 -

party to produce competent evidence that proves the existence of a disputed issue of material fact." *Id.* (quoting *Boudreau*, 212 A.3d at 598).

## Discussion

## RIWPA

The plaintiff argues that the trial justice erred in finding that he did not engage in protected conduct under the RIWPA because, in his view, he reported actual violations of the law. The plaintiff asserts that, under the plain language of § 28-50-3(4), an employee is protected from retaliation if they report a violation of the law that they reasonably know has occurred. He contends that the statute does not require the employee to know which law was violated to be afforded protection. The plaintiff argues that to hold otherwise would undermine the purpose of the RIWPA because laypeople do not see things in terms of illegal or legal, but rather right or wrong.

In response, the UMG defendants argue that plaintiff did not engage in protected conduct because he did not believe that Dr. Epstein's conduct was unlawful. Instead, plaintiff believed that the conduct was unethical. They further argue that, even if we were to accept plaintiff's interpretation of the RIWPA, he did not engage in protected conduct because he did not report actual violations of the law.

"This Court reviews questions of statutory interpretation *de novo*." *Balmuth v. Dolce for Town of Portsmouth*, 182 A.3d 576, 580 (R.I. 2018). "If a statute is clear and unambiguous, 'we must interpret the statute literally and must give the words of the statute their plain and ordinary meanings.'" *Athena Providence Place v. Pare*, 262 A.3d 679, 681 (R.I. 2021) (quoting *Balmuth*, 182 A.3d at 580).

The RIWPA provides in pertinent part:

> "An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment:
>
> "* * *
>
>> "Because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States, unless the employee knows or has reason to know that the report is false." Section 28-50-3.

The clear and unambiguous language of the statute provides that an employee is protected when he reports a violation of a law, regulation, or rule that he "knows or reasonably believes has *occurred* * * *." *Id.* (emphasis added). Accordingly, the employee need only have knowledge, or a reasonable belief, that conduct that violates the law has occurred, rather than knowledge that the conduct is actually

- 12 -

illegal. *See id.* Nevertheless, plaintiff has failed to produce evidence that he engaged in such protected conduct.

The plaintiff argues that he reported violations of the law because (a) Dr. Epstein's anger issues "would eventually lead to a hostile work environment claim"; (b) adultery is still a crime; (c) the disclosure of protected health information violated the Health Insurance Portability and Accountability Act (HIPAA); and (d) failing to pay an employee violates "Rhode Island's Wage and Hour" laws.

The plaintiff did not report to his supervisors that Dr. Epstein was engaged in "illicit sexual intercourse" while married. *See* G.L. 1956 § 11-6-2. Instead, he reported to Mr. Belcher and Dr. Sepe that Dr. Epstein was in an "inappropriately close relationship" with Ms. Kennedy. Moreover, plaintiff has not provided this Court with any meaningful discussion, analysis, or citations to explain how the remainder of his reports amounted to reports of "a violation * * * of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States * * *." Section 28-50-3. He failed to explain how Dr. Epstein's reported "anger issues" violated any state or federal employment laws.[6]

---

[6] Notably, although plaintiff argues that he was reporting conduct that might lead to a hostile work environment claim, such claims are typically dependent on membership in a protected class, rather than simply being subject to a supervisor's anger issues. *See* 14A C.J.S. *Civil Rights* § 224 (Nov. 2023 Update); *see also DeCamp v. Dollar Tree Stores, Inc.*, 875 A.2d 13, 22 (R.I. 2005) (noting that in order to prove a gender-based hostile work environment claim, a plaintiff must prove membership in a protected class).

He provided no explanation as to how Dr. Epstein's purported lying about obtaining $25,000 in "teaching money," when Dr. Sepe conveyed that Dr. Epstein had in fact obtained $13,000, violates any of "Rhode Island's Wage and Hour" laws. Further, he has not explained how Dr. Epstein's disclosing to Ms. Kennedy, a fellow health care provider, that plaintiff was depressed and thinking about going to McLean Hospital violated HIPAA.

Much time at oral argument was devoted to the alleged HIPAA violation. Nevertheless, plaintiff did not articulate how Dr. Epstein's conduct violated HIPAA. Instead, he rested on the conclusory assertion that Dr. Epstein's conduct "was in violation of [HIPAA]," and his personal belief that HIPAA applies to information disclosed to physicians in their capacity as administrators, rather than as health care professionals. Without further explanation as to how the disclosure violates any of HIPAA's broad and sweeping regulations, we must consider this issue waived.[7] *Horton v. Portsmouth Police Department*, 22 A.3d 1115, 1130 (R.I. 2011). "[S]imply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Terzian v. Lombardi*, 180 A.3d 555, 558 (R.I. 2018) (quoting *Horton*, 22 A.3d at 1130). "Nor

---

[7] The plaintiff's argument that this conduct was in violation of the Rhode Island analogue to HIPAA was never raised below and is therefore waived. *See Bouchard v. Clark*, 581 A.2d 715, 716 (R.I. 1990).

may the requesting party now advance new theories or raise new issues in order to secure a reversal of the lower court's determination." *Nedder v. Rhode Island Hospital Trust National Bank*, 459 A.2d 960, 963 (R.I. 1983) (brackets omitted) (quoting *Ludwig v. Kowal*, 419 A.2d 297, 302 (R.I. 1980)).

The plaintiff's arguments distort the evidence in a retrospective attempt to mold the facts into an RIWPA claim. Accordingly, plaintiff failed to provide evidence that he engaged in protected conduct under the RIWPA; as such, the trial justice did not err in granting summary judgment as to plaintiff's RIWPA claim. Having determined that plaintiff failed to engage in protected conduct, we need not address his arguments as to constructive discharge and causation.

**Defamation**

Next, plaintiff argues that the trial justice erred in finding that he failed to establish his defamation claims against Dr. Epstein and UMG. However, plaintiff's defamation claim abated at his death. "At common law, causes of action for slander and for libel do not survive the death of either the wrongdoer or the person injured by the wrongdoer." 1 Am. Jur. 2d *Abatement, Survival, and Revival* § 79 (Oct. 2023 Update); *see Young v. Aylesworth*, 35 R.I. 259, 262, 86 A. 555, 556 (1913); *see also Cant v. Bartlett*, 440 A.2d 388, 392-93 (Md. 1982); *Bissette v. University of Mississippi Medical Center*, 282 So.3d 507, 519 (Miss. Ct. App. 2019); *Village of Oakwood v. Makar*, 463 N.E.2d 61, 64 (Ohio Ct. App. 1983). Therefore, plaintiff's

- 15 -

defamation claim can survive, if at all, only by virtue of the survival statute. *Young*,

35 R.I. at 262, 86 A. at 556. Our survival statute provides in pertinent part:

> "In addition to the causes of action and actions which at common law survive the death of the plaintiff or defendant therein, the following causes of action or actions shall also survive.
>
> "* * *
>
> "(3) Causes of action and actions for damages to the person or to real and personal estate." General Laws 1956 § 9-1-6.

The phrase "damages to the person * * * [does] not extend to torts not directly

affecting the person, but only the feelings and reputation."[8] *Young*, 35 R.I. at 262,

86 A. at 556. Accordingly, plaintiff's defamation claim does not survive his death

and is abated. *Id.* at 262-65, 86 A. at 556-57.

---

[8] Other jurisdictions interpreting their own survival statutes have taken a contrary view and determined that any distinction between damages for emotional distress and physical injury is arbitrary. *Moyer v. Phillips*, 341 A.2d 441, 444-45 (Pa. 1975); *see Canino v. New York News, Inc.*, 475 A.2d 528, 531-32 (N.J. 1984). However, we clearly expressed our view in *Young v. Aylesworth*, 35 R.I. 259, 86 A. 555 (1913), when we determined whether a claim for conspiracy to defame survived the death of a defendant. *Young*, 35 R.I. at 262-63, 86 A. at 555-56. In *Young*, this Court held that the plaintiff's claim was not a claim for "damages to the person" because we interpreted that phrase as referring to bodily or physical injury rather than damages to feelings and reputation. *Id.* at 262, 86 A. at 556. For that reason, we held that the plaintiff's claim for conspiracy to defame could survive only if the plaintiff alleged that the tort directly damaged her estate itself under the "damages to * * * personal estate" language of the survival statute. *Id.* at 262-63, 86 A. at 556-57. Because the plaintiff was claiming injury to her reputation and because she failed to allege a direct injury to her personal estate, her claim did not survive. *Id.* at 262-65, 86 A. 556-57.

- 16 -

## Breach-of-Contract

The plaintiff next argues that the trial justice erred in determining that he failed to establish his claims for breach-of-contract. The plaintiff asserted two breach-of-contract claims: one based on UMG's failure to pay him "teaching money" and one based on its failure to compensate him for patient care. We shall first address the latter.

The plaintiff argues that the trial justice erred in finding that his breach-of-contract claim arising from UMG's failure to compensate him for patient care should have been brought under the Payment of Wages Act. He contends that he need not have brought his claim under the Payment of Wages Act because the remedies provided by this act were cumulative, rather than exclusive of his timely claim for breach-of-contract. Alternatively, plaintiff argues that his breach-of-contract claim relates back to his original complaint.

The UMG defendants note that plaintiff alleged for the first time in his 2017 amended complaint that UMG breached his employment contract by failing to pay him for patient care. Accordingly, they argue that this claim for lost wages is barred by the three-year statute of limitations established by the Payment of Wages Act. Ordinarily, the ten-year statute of limitations applicable to "all civil actions" is applied to breach-of-contract claims. *Bisbano v. Strine Printing Company, Inc.*, 135 A.3d 1202, 1209 (R.I. 2016) (quoting § 9-1-13(a)). The generally applicable statute

of limitations provides that "[e]xcept as otherwise specially provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after." Section 9-1-13(a). By contrast, civil actions brought to recover wages under the Payment of Wages Act must be filed "within three (3) years after the cause of action accrued." Section 28-14-19.2(g). The generally applicable statute of limitations applies "*[e]xcept* as otherwise specially provided." Section 9-1-13(a) (emphasis added). Accordingly, we have previously held that the more specific three-year limitations period contained in the Payment of Wages Act applies to breach-of-contract claims that are, in substance, claims brought under this act. *Bisbano*, 135 A.3d at 1209-10.

The Payment of Wages Act provides that "[a]ny employee or former employee * * * aggrieved by the failure to pay wages and/or benefits or misclassification in violation of chapter 12 of this title and/or this chapter may file a civil action in any court of competent jurisdiction to obtain relief." Section 28-14-19.2(a). This act defines "wages" as "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, commission basis, or other method of calculating the amount." Section 28-14-1(4).

Although plaintiff styled his claim for unpaid wages as one for breach-of-contract, his claim arises from UMG's failure to pay him "monies for services

- 18 -

rendered as a full-time employee of UMG in the months leading up to his resignation on April 24, 2012." Accordingly, his claim is one for failure to pay wages in violation of the Payment of Wages Act, and the three-year statute of limitations contained in § 28-14-19.2(g) is controlling. *Bisbano*, 135 A.3d at 1209; *see* §§ 28-14-1(4), 28-14-19.2(a). The plaintiff's breach-of-contract claim arising out of the failure to compensate him for patient care was not raised until he filed the amended complaint in 2017. Consequently, the claim was clearly filed more than three years after UMG allegedly failed to pay him for services rendered in 2012. Moreover, plaintiff failed to raise any argument that his patient services breach-of-contract claim relates back to the filing of his original complaint below, and it is therefore waived. *Bouchard v. Clark*, 581 A.2d 715, 716 (R.I. 1990). Accordingly, we discern no error in the trial justice's grant of summary judgment as to plaintiff's breach-of-contract claim arising out of UMG's failure to compensate him for patient care.

The plaintiff's breach-of-contract claim based upon UMG's failure to pay him for teaching duties, however, was filed on December 4, 2012, as part of his original complaint. Summary judgment was granted as to that claim because plaintiff testified that his teaching duties were voluntary rather than a requirement of his employment. The plaintiff argues that the trial justice erred because under his employment agreement, he was required to work "[forty] hours per week of clinical patient hours inclusive of teaching and administrative activities." The UMG

defendants contend that UMG was not contractually required to compensate plaintiff for teaching because this obligation appears in the "scheduling" section of the agreement. They further argue that Dr. Epstein's promise to pay plaintiff teaching money was not an enforceable contract because Dr. Epstein made it after plaintiff started teaching.

"In a breach-of-contract claim, the plaintiff must prove both the existence and breach of a contract, and that the defendant's breach thereof caused the plaintiff's damages." *Fogarty v. Palumbo*, 163 A.3d 526, 541 (R.I. 2017). Even assuming that teaching was a requirement under plaintiff's employment agreement, he did not provide evidence of a breach of the written agreement. Instead, plaintiff testified that Dr. Epstein had breached a "verbal[]" promise to provide plaintiff with "teaching money"—the additional administrative money that Dr. Epstein obtained from the hospital each year to offset the burden of teaching. This verbal promise is not by itself enforceable because the undisputed facts show that Dr. Epstein made that promise after plaintiff started teaching.

Under the preexisting duty rule, "an agreement modifying a contract is not supported by consideration if one of the parties to the agreement does or promises to do something that he is legally obligated to do * * *." *Angel v. Murray*, 113 R.I. 482, 489, 322 A.2d 630, 634 (1974). Such a modification will be enforceable only when "(1) the promise modifying the original contract was made before the contract

was fully performed on either side, (2) the underlying circumstances which prompted the modification were unanticipated by the parties, and (3) the modification is fair and equitable." *Id.* at 494-95, 322 A.2d at 637.

Doctor Epstein promised plaintiff additional teaching money after plaintiff entered into the employment agreement. Therefore, even assuming that teaching was one of plaintiff's contractual responsibilities, Dr. Epstein's promise to provide plaintiff with additional "teaching money" was not supported by consideration. *See Angel*, 113 R.I. at 493-95, 322 A.2d at 636-37. The trial justice did not err by granting the UMG defendants' motion for summary judgment as to plaintiff's "teaching money" breach-of-contract claim.

## Tortious Interference

Next, plaintiff argues that the trial justice erred in finding that he did not establish his claims for tortious interference with contractual relations. Furthermore, plaintiff argues that Dr. Epstein was a "stranger" to plaintiff's employment contract because he acted in his individual capacity. In response, the UMG defendants argue that Dr. Epstein was not a "stranger" to plaintiff's employment agreement and that, therefore, he cannot be liable for tortiously interfering with it. They further note that plaintiff has offered no evidence to show that Dr. Epstein's interference was in his own interests.

"To prevail on a claim of tortious interference with contractual relations, a plaintiff must show '(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom.'" *Tidewater Realty, LLC v. State*, 942 A.2d 986, 993 (R.I. 2008) (quoting *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973)). "[T]o establish a prima facie case of intentional interference with contract, aggrieved parties must allege and prove not only that the putative tortfeasors intended to do harm to the contract but that they did so without the benefit of any legally recognized privilege or other justification." *Belliveau Building Corporation v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000).

Although the parties vigorously contest Dr. Epstein's status as a "stranger" to the employment agreement, we need not reach this issue because plaintiff did not provide any evidence that Dr. Epstein intended to do harm to plaintiff's contract, which is an essential element of his claim. *See Doe v. Brown University*, 253 A.3d 389, 398 (R.I. 2021) (dismissing the plaintiff's intentional interference claim because the plaintiff failed to allege that the defendant's actions were an intentional interference with her contract). The plaintiff argues that Dr. Epstein tortiously interfered with plaintiff's employment contract by withholding "teaching money" and by taking over plaintiff's procedures while he was on leave, thereby "misappropriating accounts receivable." However, plaintiff offers no explanation as

- 22 -

to how these actions were intended to harm plaintiff's employment contract with UMG. Further, plaintiff's argument that Dr. Epstein interfered by "advis[ing] [plaintiff's] patients that he was no longer available to care for them, [and] * * * that Dr. Epstein, himself, would take over their care" is unavailing. Based on the undisputed facts, this alleged interference occurred on May 20, 2012, *after* plaintiff resigned. Accordingly, there was no longer an employment contract with which Dr. Epstein could interfere.

The plaintiff argues that the circumstantial evidence surrounding Ms. Siegelman's report could create an inference that Dr. Epstein coerced her to fabricate the report that interfered with plaintiff's employment contract, but he made no such arguments to the trial justice. Therefore, this argument is waived on appeal, and we find no error in the trial justice's grant of summary judgment as to plaintiff's claim for tortious interference with contractual relations. *Nedder*, 459 A.2d at 962-63.

Additionally, plaintiff contends that Dr. Epstein tortiously interfered with his prospective business relations with patients because he inaccurately advised patients that plaintiff was no longer practicing and allegedly orchestrated the April 3, 2012 police investigation. In response, the UMG defendants argue that Dr. Epstein could not have interfered with plaintiff's prospective business relationships because he never resumed the practice of medicine, so there were no prospective business relationships with which to interfere. Furthermore, they argue that plaintiff cannot

show that but for Dr. Epstein's alleged interference, plaintiff would have set up his practice in Fall River because plaintiff testified that he decided not to practice due to the trauma he associated with hospital administration.

"The elements required to establish a claim for intentional interference with prospective economic relations 'are identical to those required for a claim based on intentional interference with contractual relations, except for the requirement in the latter that an actual contract exists.'" *Lomastro v. Iacovelli*, 126 A.3d 470, 474 (R.I. 2015) (brackets omitted) (quoting *Avilla v. Newport Grand Jai Alai LLC*, 935 A.2d 91, 98 (R.I. 2007)). Therefore, the plaintiff must show both "an intentional act of interference * * * [and] proof that the interference caused the harm sustained * * *." *Burke v. Gregg*, 55 A.3d 212, 222 (R.I. 2012) (quoting *L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202, 207 (R.I. 1997)). In order to show causation, the plaintiff must show "either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." *Id.* at 222 (quoting *L.A. Ray Realty*, 698 A.2d at 207).

The plaintiff has provided no evidence that but for Dr. Epstein "inaccurately advising client[s] that [plaintiff] was no longer practicing[,]" plaintiff would have continued his practice in Fall River. Instead, plaintiff's undisputed testimony established that he did not resume practice "because of the trauma from this whole

- 24 -

thing." Despite Dr. Epstein's alleged interference, patients still emailed plaintiff to inquire when he would resume practice, but plaintiff never replied because he was "too upset to respond * * *." Therefore, it is not reasonably probable that plaintiff would have resumed practice but for Dr. Epstein informing plaintiff's patients that he was no longer practicing. *Burke*, 55 A.3d at 222.

The plaintiff's argument that Dr. Epstein coerced Ms. Siegelman to write the report and took advantage of the hospital's no-gun policy by setting up Dr. Epstein similarly fails. There is no evidence that Dr. Epstein "orchestrat[ed]" the police pat-down and subsequent interrogation because he did not know that plaintiff would bring his weapon to work, then lie about it when the police and the hospital administration investigated Ms. Siegelman's report. As such, we deem no error in the trial justice's grant of summary judgment as to plaintiff's claim for tortious interference with prospective business relationships.

### Conversion

Finally, plaintiff argues that the trial justice incorrectly concluded that he did not establish his claim for conversion because the trial justice improperly weighed evidence in determining that there was no nonhearsay testimony to support plaintiff's claim. For their part, the UMG defendants argue that summary judgment was appropriate because plaintiff failed to offer nonhearsay evidence that he made a demand for his personal laptop.

"It is well-established that a demand and refusal are usually required before an action for conversion can be brought against the possessor of a chattel who has rightfully obtained possession from one not its owner." *Fuscellaro v. Industrial National Corporation*, 117 R.I. 558, 561, 368 A.2d 1227, 1230 (1977). In such a case, the plaintiff's demand for the chattel and the defendant's refusal to surrender it are prima facie proof of conversion. *Goodbody & Co., Inc. v. Parente*, 116 R.I. 437, 440, 358 A.2d 32, 34 (1976).

The trial justice found that the plaintiff failed to provide any nonhearsay evidence to prove his demand and refusal and thus granted summary judgment as to the plaintiff's conversion claim. Nevertheless, on appeal, the plaintiff relies upon the same evidence that the trial justice determined to be hearsay. In the absence of any argument as to why disregarding the plaintiff's evidence was in error, we see no reason to set aside the decision of the trial justice. *Nuzzo v. Nuzzo Campion Stone Enterprises, Inc.*, 137 A.3d 711, 717 (R.I. 2016). Accordingly, we shall not disturb the trial justice's grant of summary judgment as to the plaintiff's conversion claim.

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The papers shall be returned to the Superior Court.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Jordan Nissensohn, Administrator of the Estate of Michael Nissensohn v. CharterCARE Home Health Services a/k/a Roger Williams Medical Center, et al. |
| **Case Number** | No. 2022-42-Appeal. (PC 12-6232) |
| **Date Opinion Filed** | January 16, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Richard D. Raspallo |
| **Attorney(s) on Appeal** | For Plaintiff: James A. Ruggieri, Esq. |
| | For Defendant: Jessica Schacher Jewell, Esq. |